# UNITED STATES v. LYNAH.

ERROR TO THE CIRCUIT COURT OF THE UNITED STATES FOR THE DISTRICT OF SOUTH CAROLINA.

No. 45. Argued January 9, 1903.—Decided February 23, 1903

All private property is held subject to the necessities of government and the right of eminent domain underlies all such rights of property.

When the United States government appropriates property which it does not claim as its own, it does so under an implied contract that it will pay the value of the property it so appropriates.

When it is alleged in an action that the government of the United States in the exercise of its powers of eminent domain and regulation of commerce, through officers and agents duly empowered thereto by acts of

Congress, places dams, training walls and other obstructions in the Savannah River in such manner as to hinder its natural flow and to raise the water so as to overflow the land of plaintiff along the banks to such an extent as to cause a total destruction of its value, and the government does not deny the ownership, admits that the work was done by authority of Congress, and simply denies that the work has produced the alleged injury and destruction, the Circuit Court of the United States has jurisdiction to inquire whether the acts done by the officers of the United States under the direction of Congress have resulted in such an overflow and injury of the land as to render it absolutely valueless and, if thereby the property was, in contemplation of law, taken and appropriated by the government, to render judgment against it for the value of the property so taken and appropriated.

Where the government of the United States by the construction of a dam, or other public works, so floods lands belonging to an individual as to totally destroy its value, there is a taking of private property within the scope of the Fifth Amendment.

The proceeding must be regarded as an actual appropriation of the land, including the possession and the fee and, when the amount awarded as compensation is paid, the title, the fee and whatever rights may attach thereto pass to the government which becomes henceforth the full owner.

Notwithstanding that the work causing the injury was done in improving the navigability of a navigable river and by the Constitution Congress is given full control over such improvements, the injuries cannot be regarded as purely consequential, and the government cannot appropriate property without being liable to the obligation created by the Fifth Amendment of paying just compensation.

On February 4, 1897, defendants in error commenced their action in the Circuit Court of the United States for the District of South Carolina to recover of the United States the sum of $10,000 as compensation for certain real estate (being a part of a plantation known as Verzenobre) taken and appropriated by the defendant.

The petition alleged in the first paragraph the citizenship and residence of the petitioners; in the second, that they had a claim against the United States under an implied contract for compensation for the value of property taken by the United States for public use; third, that they were the owners as tenants in common of the plantation; and in the fourth and seventh paragraphs:

"Fourth. That for several years continuously, and now continuously, the said government of the United States of America,

in the exercise of its power of eminent domain under the Constitution of the United States and by authority of the acts of Congress, duly empowering its officers and agents thereto, in that case made and provided, did erect, build and maintain, and continuously since have been erecting, building and maintaining, and are now building, erecting and maintaining in and across the said Savannah River, in the bed of the said Savannah River, certain dams, training walls and other obstructions, obstructing and hindering the natural flow of the said Savannah River through, in and along the natural bed thereof and raising the said Savannah River —— feet at the point of and above the said obstructions and dams in the bed of the said Savannah River, and causing the said waters of the Savannah River aforesaid to be kept back and to flow back and to be raised and elevated above the natural height of the Savannah River along its natural bed at the points of the said dams, training walls and obstructions, and at points above the said dams, training walls and obstructions in said river."

"Seventh. And your petitioners further show that the said acts of the government of the United States, as aforesaid, have been done and are being done lawfully by the officers and agents of the United States under the authority of the United States in the exercise of its powers of eminent domain and regulation of commerce under the Constitution of the United States and the laws of Congress for the public purpose of the improvement of the harbor of Savannah and deepening the waters of the Savannah River at the port of Savannah, a port of entry of the United States and seaport of the United States of America, situated within the State of Georgia, on the Savannah River, and with the purpose of deepening and enlarging the navigable channel and highway for commerce of the said Savannah River for the public use, purpose and benefit of interstate and foreign and international trade and commerce, and for other public purposes, uses and benefits."

The remaining paragraphs set forth the effect of the placing by the government of the dams, restraining walls and other obstructions in the river, together with the value of the property appropriated by the overflow. The answer of the government averred:·

"First. That this defendant has no knowledge or information sufficient to form a belief as to the truth of the allegations contained in the first and third paragraphs of the said petition and complaint.

"Second. That this defendant denies all of the allegations contained in the second, fourth, fifth, sixth, seventh and eighth paragraphs of the said petition and complaint except so much of the fourth paragraph as alleges that the said United States heretofore erected certain dams in the Savannah River pursuant to power vested in it by law, and except so much of the seventh paragraph as alleges that the said dams heretofore erected by the United States were lawfully erected by its officers and agents."

For a further defence the statute of limitations was pleaded. The case came on for trial before the court without a jury, which made findings of fact, and from them deduced conclusions of law and entered a judgment against the defendant for the sum of $10,000. The findings were to the effect that the plaintiffs were the owners of the plantation, deriving title by proper mesne conveyances from "a grant by the lords proprietors of South Carolina," made in 1736. Other findings pertinent to the questions which must be considered in deciding this case were as follows:

"IV. A certain parcel of these plantations, measuring about 420 acres, had been reclaimed by drainage and had been in actual continued use for seventy years and upwards as a rice plantation, used solely for this purpose. This rice plantation was dependent for its irrigation upon the waters of the Savannah River and its ditches, drains and canals, through and by which the waters of the river were flowed in and upon the lands, and were then drained therefrom, were adapted to the natural level of the said Savannah River, and dependent for their proper drainage and cultivation upon the maintenance of the natural flow of the said river in, through and over its natural channel along its natural bed to the waters of the ocean.

"V. This portion of the plantation fronting on the river and dedicated to the culture of rice, extended almost up to if not quite to low water mark, and a large part of it was between

mean high water and low water mark, protected from the river by an embankment. Through this embankment trunks or waterways were constructed, with flood gates therein. The outer opening of the trunk was about a foot or a little less above the mean low water mark of the river, in which the tide ebbs and flows. When it is desired to flow the lands the flood gates are opened and the water comes in. When it is desired to draw off this water and to effect the drainage of the lands, the flood gates are opened at low water and the water escapes. It is essential that the outlets of the trunks or waterways should always be above the mean low water mark.

*   *   *   *   *   *   *   *

"VII. For several years last past and at the present time the government of the United States, under its proper officers, authorized thereto by the act of Congress, have been engaged in the improvement of the navigation of the Savannah River, a navigable water of the United States, this improvement being carried on by virtue of the provisions of section 8, article I, of the Constitution, giving to the Congress the power to regulate commerce.

"VIII. In thus improving navigation of this navigable water the United States has built and maintained and is now building and maintaining in and across the Savannah River, in the bed thereof, certain dams, training walls and other obstructions, obstructing the natural flow of said river in and along its natural bed, and so raising the level of said river above said obstructions, and causing its waters to be kept back and to flow back and to be elevated above its natural height in its natural bed.

"IX. This rice plantation Verzenobre is above these obstructions. The direct effect thereof is to raise the level of the Savannah River at this plantation, and to keep the point of mean low water above its natural point, so that the outlet of the trunks and waterways above spoken of in the bank of said plantation, instead of being above this point of low water mark, is now below this point. Another direct result was that by seepage and percolation the water rose in the plantation until the water level in the land gradually rose to the height

of the increased water level in the river, and the superinduced addition of water in the plantation was about eighteen inches thereby. By reason of this it gradually became difficult, and has now become impossible, to let off the water on this plantation or to drain the same, so that these acres dedicated to the culture of rice have become boggy, unfit for cultivation and impossible to be cultivated in rice.

" X. By the raising of the level of the Savannah River by these dams and obstructions the water thereof has been backed up against the embankment on the river and has been caused to flow back upon and in this plantation above the obstruction, and has actually invaded said plantation, directly raising the water in said plantation about eighteen inches, which it is impossible to remove from said plantation. This flooding is the permanent condition now, and the rice plantation is thereby practically destroyed for the purpose of rice culture or any other known agriculture, and is an irreclaimable bog and has no value.

" XI. By reason of this superinduced addition of water actually invading the said rice plantation and its destruction thereby for all purposes of agriculture, plaintiffs have been compelled to abandon the cultivation of said rice plantation and have been forced to pursue their calling of planting rice on other plantations below the dams. The direct result to plaintiffs is an actual and practical ouster of possession from this rice plantation, cultivated by themselves and family for many years.

" XII. Beyond the backing up of the water on and in the plantation by reason of the dams and obstruction, and the invasion of these lands by this superinduced addition of water at and in the plantation as above described, rendered necessary by the execution of the government's plans, the United States is not in actual possession of these lands.

" XIII. Up to this time no other use has been discovered for these lands than for rice culture, and the direct results above stated have totally destroyed the market value of the lands. They now have no value.

" XIV. The value of these rice lands before the obstructions

aforesaid were put into the river was about thirty dollars per acre, between twenty-five and thirty dollars per acre. The value of the rice plantation, 420 acres, thus destroyed is ten thousand dollars."

Upon these findings of fact the important conclusions of law were thus stated :

" V. The crucial question in this case is, Was there a taking of this land in the sense of the Constitution ?

" The facts found show that by reason of the obstruction in the Savannah River the water has been directly backed up against the embankment on the river and the banks on and in this plantation, the superinduced addition of water actually invading it and destroying its drainage and leaving it useless for all practical purposes. The government does not in a sense take this land for the purposes of putting its obstructions on it. But it forces back the water of the river on the land as a result necessary to its purpose, without which its purpose could not be accomplished. For the purpose of the government, that water in the river must be raised. The banks of this plantation materially assist this operation, for by their resistance the water is kept in the channel. The backing up of the water against the banks to create this resistance raises the water in the plantation and destroys the drainage of the plantation. This is a taking. 'It would,' says Mr. Justice Miller, 'be a very curious and unsatisfactory result if, in construing a provision of constitutional law, always understood to have been adopted for protection and security to the rights of the indivividual as against the government, and which had received the commendation of jurists, statesmen and commentators as placing the just principles of the common law on that subject beyond the power of ordinary legislation to change or control them, it shall be held that if the government refrains from the absolute conversion of real property to the uses of the public, it can destroy its value entirely, can inflict irreparable and permanent injury to any extent ; can, in effect, subject to total destruction without making any compensation, because in the narrowest sense of that word it has not been taken for the public use.' *Pumpelly* v. *Geeen Bay*

*Co.,* 13 Wall. 177, 178.   In that case the backing up of water on land was held to be a taking.

" VI. The plantation of plaintiffs being actually invaded by superinduced addition of water directly caused by the government dams and obstructions backing up the water of the Savannah River and raising the water level at and in the rice plantation and making it unfit for rice cultivation or for any other known agriculture, and plaintiffs have been compelled thereby to abandon the plantation, and this actual and practical ouster of possession being continued and permanent by reason of the permanent condition of the flooding of the plantation, and the plantation being thereby now an irreclaimable bog of no value, makes the action of the government a taking of lands for public purposes within the meaning of the Fifth Amendment, for which compensation is due to the plaintiffs.   *Pumpelly* v. *Green Bay Co.,* 13 Wall. 182; *Mugler* v. *Kansas,* 123 U. S. 668.

" VII. The government has not gone into actual occupancy of this land, but by reason of these dams and obstructions made necessary by this public work and fulfilling its purpose the water in the Savannah River has been raised at the plaintiffs' plantation and has been backed up on it and remains on it so that the drainage has been destroyed and ditches filled up and superadded water permanently kept on the land and forced up into it, making it wholly unfit for cultivation, and the plaintiffs have thereby been practically and actually ousted of their possession. This is taking of the land for public purposes, for which compensation must be provided.   *Pumpelly* v. *Green Bay Co.,* 13 Wall. 181."

. The case involving the application of the Constitution of the United States was brought by writ of error directly to this court

*Mr. Robert A. Howard* for the plaintiff in error with whom *Mr. Solicitor General Richards* was on the brief.

As the original grantors of the defendants in error obtained grants the boundaries whereof were " on the Savannah River " the grants only extend to high water mark.   *United States* v. *Pacheco,* 2 Wall. 587; *State* v. *Pinckney,* 22 S. C. 484, 507;

*Martin* v. *Waddell*, 16 Peters, 367; *Shively* v. *Bowlby*, 152 U. S. 1; *Morris* v. *United States*, 174 U. S. 196, 226.

An individual may be the owner of a portion of the shore by a grant from the State but he takes the ownership subject to the trust for the people which cannot be destroyed or diminished. Hall, Sea Shore, 15; Hale *de jure Maris* Hay, L. T. c. V.; 5 Co. 107; *Illinois Cent. R. R. Co.* v. *Illinois*, 146 U. S. 387, 435, 452; *Stockton* v. *Balt. & N. Y. R. Co.*, 32 Fed. Rep. 19; 3 Kent, 377; *Commonwealth* v. *Roxbury*, 9 Gray, 451; *State* v. *Pacific Guano Co.*, 22 S. C. 48, 83; *Attorney General* v. *Parmenter*, 10 Price, 378.

The government has not taken possession of these lands by the erection of structures thereon or physical entering upon them, but whatever was done was under the direction of Congress to accomplish the purpose of improving the navigability of the Savannah River which is complete. *Gibbons* v. *Ogden*, 9 Wheat. 196; *Hoboken* v. *Railroad Co.*, 124 U. S. 659; *Mobile* v. *Kimball*, 102 U. S. 691; *Gilman* v. *Philadelphia*, 3 Wall. 724; *South Carolina* v. *Georgia*, 93 U. S. 4; *Telegraph Co.* v. *Telephone Co.*, 96 U. S. 1.

The power in the United States includes "all the powers which existed in the States before the adoption of the Constitution." Whatever consequences follow in its exercise are to be provided for exactly as they had been or would be in the British Isles or in the States of the Union.

One of the primary objects, as has been so often stated, was to regulate commerce, and, in doing so, to reach out and absolutely control navigation and all the navigable waters of the country for the benefit of the people. When this court said, in *Martin* v. *Waddell*, that the sovereign people of each State hold the absolute right to all their navigable waters, and the soils under them, for their own common use subject only to the rights since surrendered by the Constitution to the general government, and that the grants made by their authority must be determined by different principles from those which apply to grants of the British Crown, it was not meant, simply, that the people, through their representatives, could arbitrarily dispose of the trust property. That is not the theory of representative

government. That would not be tolerated long in a fierce democracy.

The court below found, it being a question of law and fact, that there had been such a taking of the land as entitled the parties to compensation. Reliance for this conclusion was had upon the principles laid down by this court in the cases of *Monongahela N. Co.* v. *United States,* 148 U. S. 336–337; *Gibson* v. *United States,* 166 U. S. 269, and explicitly *Pumpelly* v. *Green Bay Co.,* 13 Wall. 181; but these cases do not sustain the contention of the plaintiffs, the defendants in error, and can be distinguished from the cases at bar.

But, what private property was taken for which compensation should be made under this guarantee of the Constitution, which is only affirmative of a right to the individual in a free government like this? The Crown had property rights in these lands in trust. The State had property rights to these lands in trust. They were never surrendered. They could not be. And when the United States reached out her hand and took possession of them to execute the trust to which she had succeeded, and which she was *legally* bound to execute, the inferior right had to yield, even to extermination. It is not for the courts to say that the individual has suffered and therefore should be reimbursed or compensated. If he has been, under a mistaken idea of his rights, put to labor and expense and hope, he has a remedy by application to the bounty of a government which will, it is opined, do him justice. But no wrong has been done him. He has enjoyed these lands and their profits without money and without price. They were the common property of the whole people. The accident of adjacent ownership gave him the license and the privilege; for, in the last instance, it was a privilege. *South Carolina* v. *Georgia,* 93 U. S. 1; *Scranton* v. *Wheeler,* 179 U. S. 141; *Webber* v. *Pere Marquette Boom Co.,* 62 Michigan, 626, and cases there cited.

It is equally well settled in that State that the rights of the riparian owner are subject to the public easement or servitude of navigation. *Lorman* v. *Benson,* 8 Michigan, 18, 32; *Ryan* v. *Brown,* 18 Michigan, 196, 207. So that whether the title to the submerged lands of navigable waters is in the State or in the

riparian owners, it was acquired subject to the rights which the public have in the navigation of such waters. The primary use of the waters and the lands under them is for purposes of navigation, and the erection of piers in them to improve navigation for the public is entirely consistent with such use, and infringes no right of the riparian owner. Whatever the nature of the interest of a riparian owner in the submerged lands in front of his upland bordering on a public navigable water, his title is not as full and complete as his title to fast land which has no direct connection with the navigation of such water. It is a qualified title, a bare technical title, not at his absolute disposal, as is his upland, but to be held at all times subordinate to such use of the submerged lands and of the waters flowing over them as may be consistent with or demanded by the public right of navigation.

In our opinion, it was not intended that the paramount authority of Congress to improve the navigation of the public navigable waters of the United States to meet the demands of international and interstate commerce should be crippled by compelling the government to make compensation for the injury to a riparian owner's right of access to navigability that might incidentally result from an improvement ordered by Congress. The subject with which Congress dealt was navigation. That which was sought to be accomplished was simply to improve navigation on the waters in question so as to meet the wants of the vast commerce passing and to pass over them. Consequently the agents designated to perform the work ordered or authorized by Congress had the right to proceed in all proper ways without taking into account the injury that might possibly or indirectly result from such work to the right of access by riparian owners to navigability. To conclude: The plaintiff in error claims that, conceding the interest and property which the defendants in error had in these lands, there was not in them a title to " such kind of property as was susceptible of pecuniary compensation, within the meaning of the Constitution." What the government took, and takes under similar circumstances, wa the public property. It is not going too far, maybe, to asser that no private property is taken at all. The private property

under the grant is eclipsed when the necessity for public use is properly determined. How could there be a settlement of the value of the private property? By what rule could the measure of damage and injury be arrived at? All the land on all the coasts and tide waters of the country might be affected by the exercise of this necessary and sovereign and paramount power —paramount against States and individuals in exactly the same degree. And it is not extravagant to say that the power might be dangerously hurt and imperiled if it was subject to doubt or cavil or diminution.

In the supplemental and reply briefs additional authorities were cited. On the question of jurisdiction, Keener on Quasi-Contracts, pp. 159 *et seq.; National Trust Co.* v. *Gleason,* 77 N. Y. 400; *United States* v. *Great Falls Mfg. Co.,* 112 U. S. 657; *Great Falls Mfg. Co.* v. *Attorney General,* 124 U. S. 597. As to liability of United States, *Shively* v. *Bowlby,* 152 U. S. 1, and authorities reviewed; *Hardin* v. *Jordan,* 140 U. S. 371; cases cited in *Hoboken* v. *Penn. R. R. Co.,* 124 U. S. 688; *People* v. *N. Y. & S. I. Ferry Co.,* 68 N. Y. 71; *Lloyd* v. *Hough,* 1 How. 153; *Langford* v. *United States,* 101 U. S. 341; *Hill* v. *United States,* 149 U. S. 593; *Schillinger* v. *United States,* 155 U. S. 163. The soil under navigable waters being held by the people of the State in trust for the common use, and as a portion of their inherent sovereignty, any act of legislation concerning their use affects the public welfare. *Ill. Cent. R. R. Co.* v. *Illinois,* 146 U. S. 459; *McCready* v. *Virginia,* 94 U. S. 391; *Pollard* v. *Hagan,* 3 How. 212; *Boston* v. *Lecraw,* 17 How. 426; *Commonwealth* v. *Charlestown,* 1 Pickering, 180; *Commonwealth* v. *Alger,* 7 Cushing 53, 78; *Rundle* v. *Del. & Raritan Canal Co.,* 14 How. 186; Phear on Waters, 52, 53.

While it is true that these lands have been reclaimed, yet they have been only temporarily relieved from the action of the ordinary tides; their relation to the Savannah River was only interrupted—not destroyed. *Davidson* v. *Boston & Maine R. R. Co.,* 3 Cush. 91, 105.

These cases cannot be brought within the *Pumpelly* case which was a suit in trespass, as was also *Eaton* v. *Boston &c. R.*

*R. Co.*, 51 N. H. 504; and there cases are also different from *United States* v. *Monongahela Nav. Co.*, 148 U. S. 312, and *Kaukauna Water Power Co.* v. *Green Bay &c. Co.*, 142 U. S. 254.

*Mr. J. P. Kennedy Bryan* for defendant in error in No. 45. *Mr. Julian Mitchell, Jr.*, with whom *Mr. Julian Mitchell* and *Mr. Henry A. M. Smith* were on the brief for defendants in error in No. 59.

The cause of action accrued within six years. *Saulet* v. *Shepherd*, 4 Wall. 507; *Steel* v. *Bryant*, 49 Iowa, 116; 19 Am. & Eng. Enc. of Law, 2d ed. 195, and cases cited; *Kendall* v. *United States*, 107 U. S. 125; *High Bridge Lumber Co.* v. *United States*, 69 Fed. Rep. 326.

There has been an actual taking of the property. The principle that a permanent flooding was " a taking " thereof as established in *Pumpelly* v. *Green Bay Co.*, 13 Wall. 117, has never been modified. *Mugler* v. *Kansas*, 123 U. S. 667; *Gibson* v. *United States*, 166 U. S. 275; *Meyer* v. *Richmond*, 172 U. S. 96; *Scranton* v. *Wheeler*, 179 U. S. 154; *United States* v. *Alexander*, 148 U. S. 187; *Transportation Co.* v. *Chicago*, 99 U. S. 635. The Fifth Amendment should be construed liberally. 1 Blackstone's Com. 139; *Sinnickson* v. *Johnson*, 17 N. J. L. 129; *Eaton* v. *Boston &c. R. R. Co.*, 51 N. H. 504.

The ownership of the defendants in error was not always subservient to the right of the government to flood the same for the benefit of navigation. The facts found show that they were the owners in fee simple and that a portion of the lands lie between high and low water mark. Under the rule in South Carolina the ownership extends to low water mark. *State* v. *Pacific Guano Co.*, 22 S. C. 50; 24 S. C. 598; *State* v. *Pinckney*, 22 S. C. 492; *Heyward* v. *Farmers Mining Co.*, 42 S. C. 138; *Shively* v. *Bowlby*, 152 U. S. 1, 13, 26; *Lowndes* v. *Board &c.*, 153 U. S. 18; *Hardin* v. *Jordan*, 140 U. S. 371.

The power conferred by the States on Congress by the adoption of the Constitution giving to Congress the control of commerce, and of navigation in furtherance thereof, is limited by the Fifth Amendment.

The national government possesses no greater power over commerce than that possessed by each individual State, and which was ceded by the terms of the Constitution to the general government. The State of South Carolina could not take these lands nor can the United States take them without compensation. *Monongahela Nav. Co.* v. *United States,* 148 U. S. 341.

There was an implied contract on the part of the government to compensate for the taking. Cases cited *supra,* and *Kaukauna Water Co.* v. *Green Bay &c. Canal Co.,* 142 U. S. 254; *United States* v. *Great Falls Mfg. Co.,* 112 U. S. 645; *Kohl* v. *United States,* 91 U. S. 367; Parsons on Contracts, vol. 1, 5; 15 Am. & Eng. Enc. of Law. 1078; Cooley on Torts, 109; 2 Austin, Jurisprudence, 5th ed. 912; 2 Harvard Law Review, History of Assumpsit, 64; *Gilliam* v. *United States,* 8 Wall. 274; *Langford* v. *United States,* 101 U. S. 345.

MR. JUSTICE BREWER, after making the foregoing statement, delivered the opinion of the court.

There are three principal questions in this case: First, did the Circuit Court have jurisdiction; second, was there a taking of the land within the meaning of the Fifth Amendment; and, third, if there was a taking, was the government subject to the obligation of making compensation therefor?

Did the Circuit Court have jurisdiction? It may be premised that this question was not raised in the Circuit Court, nor was it presented to this court on the first argument but only upon the reargument. This omission on the part of the learned counsel for the government is certainly suggestive. Nevertheless as the question, now for the first time presented, is one of jurisdiction it must be considered and determined. To sustain the challenge of jurisdiction it is insisted by the government that there was no implied contract, but simply tortious acts on the part of its officers, and *Hill* v. *United States,* 149 U. S. 593, and *Schillinger* v. *United States,* 155 U. S. 163, are relied upon. Let us see what those cases were and what they decided. In the former the plaintiff sued to recover from the United States for the use and occupation of land for a lighthouse. The land upon which the lighthouse was built was submerged land in Chesa-

peake Bay. The government pleaded that it had a paramount right to the use of the land, and that plea was demurred to. It was held that the Circuit Court had no jurisdiction, and in the opinion delivered by Mr. Justice Gray it was said, after referring to several cases (pp. 598–9):

"In *Langford* v. *United States*, it was accordingly adjudged that, when an officer of the United States took and held possession of land of a private citizen, under a claim that it belonged to the government, the United States could not be charged upon an implied obligation to pay for its use and occupation.

"It has since been held that if the United States appropriate to a public use land which they admit to be private property, they may be held, as upon an implied contract, to pay its value to the owner. *United States* v. *Great Falls Manufacturing Company*, 112 U. S. 645, and 124 U. S. 581. It has likewise been held that the United States may be sued in the Court of Claims for the use of a patent for an invention, the plaintiff's right in which they have acknowledged. *Hollister* v. *Benedict Manufacturing Company*, 113 U. S. 59; *United States* v. *Palmer*, 128 U. S. 262. But in each of these cases the title of the plaintiff was admitted, and in none of them was any doubt thrown upon the correctness of the decision in *Langford's* case. See *Schillinger* v. *United States*, 24 C. Cl. 278.

"The case at bar is governed by *Langford's* case. It was not alleged in this petition, nor admitted in the plea, that the United States had ever in any way acknowledged any right of property in the plaintiff as against the United States. The plaintiff asserted a title in the land in question, with the exclusive right of building thereon, and claimed damages of the United States for the use and occupation of the land for a lighthouse. The United States positively and precisely pleaded that the land was submerged under the waters of Chesapeake Bay, one of the navigable waters of the United States, and that the United States, 'under the law, for the purpose of a lighthouse, has a paramount right to its use as against the plaintiff or any other person;' and the plaintiff demurred to this plea."

In the other case it appeared that the architect of the Capitol contracted with G. W. Cook for the laying of pavement in the

Capitol grounds. The contractor in laying the pavement infringed, as petitioners claimed, upon rights granted to them by patent. Thereafter this suit was brought, not against the party guilty of the alleged infringement, but against the United States which had accepted the pavement in the construction of which, as petitioners claimed, the contractor had infringed upon their rights. In the opinion it was said (p. 170):

" Here the claimants never authorized the use of the patent right by the government; never consented to, but always protested against it, threatening to interfere by injunction or other proceedings to restrain such use. There was no act of Congress in terms directing, or even by implication suggesting, the use of the patent. No officer of the government directed its use, and the contract which was executed by Cook did not name or describe it. There was no recognition by the government or any of its officers of the fact that in the construction of the pavement there was any use of the patent, or that any appropriation was being made of claimant's property. The government proceeded as though it were acting only in the management of its own property and the exercise of its own rights, and without any trespass upon the rights of the claimants. There was no point in the whole transaction from its commencement to its close where the minds of the parties met or where there was anything in the semblance of an agreement. So not only does the petition count upon a tort, but also the findings show a tort. That is the essential fact underlying the transaction and upon which rests every pretence of a right to recover. There was no suggestion of a waiver of the tort or a pretence of any implied contract until after the decision of the Court of Claims that it had no jurisdiction over an action to recover for the tort."

How different is the case at bar! The government did not deny the title of the plaintiffs. It averred in the answer simply that it had "no knowledge or information sufficient to form a belief," but did not couple such averment with any denial, nor did it pretend that it owned the property or had a paramount proprietary right to its possession. It did not put in issue the question of title, but rested upon a denial that the acts its offi-

cers had done by its direction had overflowed the land and wrought the injury as alleged, or that such overflow and injury created an implied contract, and also upon the bar of the statute of limitations. Nowhere in the record did it set up any title to the property antagonistic to that claimed by the plaintiffs. It simply denied responsibility for what it had caused to be done, and pleaded that if it had ever been liable, the statute of limitations had worked a bar. No officer of the government, as in the *Langford* case, claimed that the property found by the court to be the property of the plaintiffs, belonged to the government. While there was no formal admission of record that the land belonged to the plaintiffs, the case was tried alone upon the theory that the government could not be held responsible for what it had done. It did not repudiate the actions of its officers and agents, but on the contrary in terms admitted that they acted by authority of Congress, and that all that they did was lawfully done. So that if the overflow and destruction of this property was, as we shall presently inquire, a taking and appropriation within the scope of the Fifth Amendment to the Constitution, the jurisdictional question now presented is whether such appropriation directed by Congress created an implied contract on the part of the government to pay for the value of the property so appropriated. Let us see what this court has decided. In *United States* v. *Great Falls Manufacturing Company*, 112 U. S. 645, Congress having made an appropriation therefor, a dam was constructed across the Potomac with the view of supplying the city of Washington with water. In the construction of such dam certain lands belonging to the plaintiff were taken, although such lands were not by the act of Congress specifically ordered to be taken. The property so taken not having been paid for, plaintiff brought this action in the Court of Claims to recover the value thereof, and it was held that the action might be maintained, and in the opinion it was said (p. 656):

" It seems clear that these property rights have been held and used by the agents of the United States, under the sanction of legislative enactments by Congress; for, the appropriation of money specifically for the construction of the dam from the

Maryland shore to Conn's Island was, all the circumstances considered, equivalent to an express direction by the legislative and executive branches of the government to its officers to take this particular property for the public objects contemplated by the scheme for supplying the capital of the nation with wholesome water. The making of the improvements necessarily involves the taking of the property; and if, for the want of formal proceedings for its condemnation to public use, the claimant was entitled, at the beginning of the work, to have the agents of the government enjoined from prosecuting it until provision was made for securing, in some way, payment of the compensation required by the Constitution—upon which question we express no opinion—there is no sound reason why the claimant might not waive that right, and, electing to regard the action of the government as a taking under its sovereign right of eminent domain, demand just compensation. *Kohl* v. *United States*, 91 U. S. 367, 374. In that view we are of opinion that the United States, having by its agents, proceeding under the authority of an act of Congress, taken the property of the claimant for public use, are under an obligation, imposed by the Constitution, to make compensation. The law will imply a promise to make the required compensation, where property to which the government asserts no title, is taken, pursuant to an act of Congress, as private property to be applied for public uses. Such an implication being consistent with the constitutional duty of the government, as well as with common justice, the claimant's cause of action is one that arises out of implied contract, within the meaning of the statute which confers jurisdiction upon the Court of Claims of actions founded 'upon any contract, express or implied, with the government of the United States.'"

In *Great Falls Manufacturing Company* v. *The Attorney General*, 124 U. S. 581, an action, which, like the preceding, grew out of provisions made by Congress to supply water to the city of Washington, and in which the relief sought was the removal of all structures on the premises, or if it should appear that the property had been legally condemned, the framing of an issue, triable by jury, to ascertain the plaintiff's damages, and a judgment for the amount thereof, it was said, referring to the

contention that there were certain defects in the proceedings taken by the government (p. 597):

" Even if the Secretary's survey and map, and the publication of the Attorney General's notice did not, in strict law, justify the former in taking possession of the land and water rights in question, it was competent for the company to waive the tort, and proceed against the United States, as upon an implied contract, it appearing, as it does here, that the government recognizes and retains the possession taken in its behalf for the public purposes indicated in the act under which its officers have proceeded."

In *Hollister* v. *Benedict Manufacturing Company*, 113 U. S. 59, an action by the assignees of a patent against a United States collector for infringement, the law is thus stated (p. 67):

" If the right of the patentee was acknowledged, and, without his consent, an officer of the government, acting under legislative authority, made use of the invention in the discharge of his official duties, it would seem to be a clear case of the exercise of the right of eminent domain, upon which the law would imply a promise of compensation, an action on which would lie within the jurisdiction of the Court of Claims, such as was entertained and sanctioned in the case of *The United States* v. *The Great Falls Manufacturing Company*, 112 U. S. 645."

In *United States* v. *Palmer*, 128 U. S. 262, an action in the Court of Claims by a patentee against the government to recover upon an implied contract for the use of the patented invention, it appeared that the petitioner was the patentee of certain improvements in infantry equipments which were adopted by the Secretary of War as a part of the equipment of the infantry soldiers of the United States, and, sustaining the jurisdiction of the Court of Claims, it was said (p. 269):

" No tort was committed or claimed to have been committed. The government used the claimant's improvements with his consent; and, certainly, with the expectation on his part of receiving a reasonable compensation for the license. This is not a claim for an infringement, but a claim of compensation for an authorized use—two things totally distinct in the law, as

distinct as trespass on lands is from use and occupation under a lease."

In *United States* v. *Berdan Fire-Arms Company*, 156 U. S. 552, a judgment of the Court of Claims against the United States on an implied contract for the use of an improvement in breechloading firearms was sustained, although there was no act of Congress expressly directing the use of such improvement. In the opinion it was said (p. 567):

" While the findings are not so specific and emphatic as to the assent of the government to the terms of any contract, yet we think they are sufficient. There was certainly no denial of the patentee's rights to the invention ; no assertion on the part of the government that the patent was wrongfully issued; no claim of a right to use the invention regardless of the patent ; no disregard of all claims of the patentee, and no use, in spite of protest or remonstrance. Negatively, at least, the findings are clear. The government used the invention with the consent and express permission of the owner, and it did not, while so using it repudiate the title of such owner."

And then, after quoting from several of the findings, it was added (p. 569):

" The import of these findings is this : That the officers of the government, charged specially with the duty of superintending the manufacture of muskets, regarded Berdan as the inventor of this extractor-ejector ; that the difference between the spiral and flat spring was an immaterial difference; that, therefore, they were using in the Springfield musket Berdan's invention ; that they used it with his permission as well as that of his assignee, the petitioner, and that they used it with the understanding that the government would pay for such use as for other private property which it might take, and this, although they did not believe themselves to have the authority to agree upon the price."

The rule deducible from these cases is that when the government appropriates property which it does not claim as its own it does so under an implied contract that it will pay the value of the property it so appropriates. It is earnestly contended in argument that the government had a right to appropriate this

property. This may be conceded, but there is a vast difference between a proprietary and a governmental right. When the government owns property, or claims to own it, it deals with it as owner and by virtue of its ownership, and if an officer of the government takes possession of property under the claim that it belongs to the government (when in fact it does not) that may well be considered a tortious act on his part, for there can be no implication of an intent on the part of the government to pay for that which it claims to own. Very different from this proprietary right of the government in respect to property which it owns is its governmental right to appropriate the property of individuals. All private property is held subject to the necessities of government. The right of eminent domain underlies all such rights of property. The government may take personal or real property whenever its necessities or the exigencies of the occasion demand. So the contention that the government had a paramount right to appropriate this property may be conceded, but the Constitution in the Fifth Amendment guarantees that when this governmental right of appropriation—this asserted paramount right—is exercised it shall be attended by compensation.

The government may take real estate for a post office, a court house, a fortification or a highway; or in time of war it may take merchant vessels and make them part of its naval force. But can this be done without an obligation to pay for the value of that which is so taken and appropriated? Whenever in the exercise of its governmental rights it takes property, the ownership of which it concedes to be in an individual, it impliedly promises to pay therefor. Such is the import of the cases cited as well as of many others.

The action which was taken, resulting in the overflow and injury to these plaintiffs, is not to be regarded as the personal act of the officers but as the act of the government. That which the officers did is admitted by the answer to have been done by authority of the government, and although there may have been no specific act of Congress directing the appropriation of this property of the plaintiffs, yet if that which the officers of the government did, acting under its direction, resulted in an ap-

propriation it is to be treated as the act of the government. *South Carolina* v. *Georgia*, 93 U. S. 4, 13; *Wisconsin* v. *Duluth*, 96 U. S. 379; *United States* v. *Great Falls Manufacturing Company, supra.*

Congress for many successive terms appropriated money for the improvement of the Savannah River. 21 Stat. 470, 480; 22 Stat. 194, 200; 23 Stat. 140; 24 Stat. 321, 331; 25 Stat. 413; 26 Stat. 442; 27 Stat. 101; 28 Stat. 351. These appropriations were in the river and harbor bills, and were generally of so much money for improving the river, but some deserve special mention. Thus, in 21 Stat. 470, it was provided that " one thousand dollars may be applied to payment of damages for land taken for widening the channel opposite Savannah." In 24 Stat. 331, the Secretary of War was directed to cause a survey to be made of the " Savannah River from cross tides above Savannah to the bar, with a view to obtaining twenty-eight feet of water in the channel." The appropriation in 25 Stat. 413 was for the improvement of the river, " completing the present project and commencing the extended project contained in the report of Engineer for year ending June 30, 1887." And by the same statute, 431, among the matters referred to the Secretary of War for survey and examination was " whether the damage to the Vernezobie Freshet Bank in 1887 was caused by the work at cross tides, and whether the maintenance of said bank is essential to the success of the work at cross tides, and what will be the cost of so constructing said bank as to confine the water of said river to its bed." The report of the engineers for the year 1887, referred to in the section above quoted, shows that part of the work which was being done by the government was in the construction of training walls, and wing dams, by which the width of the waterway was reduced.

Further, the same year, 25 Stat. 94, an act was passed, entitled " An act to facilitate the prosecution of works projected for the improvement of rivers and harbors," which authorized the Secretary of War to commence proceedings " for the acquirement by condemnation of any land, right of way, or material needed to enable him to maintain, operate or prosecute works for the improvement of rivers and harbors for which pro-

vision has been made by law ; . . . *Provided, however,* That, when the owner of such land, right of way, or material shall fix a price for the same, which in the opinion of the Secretary of War, shall be reasonable, he may purchase the same at such price without further delay."

Thus, beyond the effect of the admission in the answer, and beyond the presumption of knowledge which attends the action of all legislative bodies, it affirmatively appears not only that Congress was making appropriations from year to year for the improvement of the river, but also that it had express notice of damage to the banks along this very plantation ; that the works which were being done by the engineers had in view the narrowing of the width of the waterway ; that land would be damaged as the result of those works, and that it authorized the Secretary of War to take proceedings in eminent domain to acquire the land, right of way and material which might be necessary for maintaining, operating or prosecuting works of river improvement, or, if the price could be agreed upon, to purchase the same.

This brings the case directly within the scope of the decision in *United States* v. *Great Falls Manufacturing Company, supra,* where, as here, there was no direction to take the particular property, but a direction to do that which resulted in a taking, and it was held that the owner might waive the right to insist on condemnation proceedings and sue to recover the value.

It does not appear that the plaintiffs took any action to stop the work done by the government, or protested against it. Their inaction and silence amount to an acquiescence—an assent to the appropriation by the government. In this respect the case is not dissimilar to that of a landowner who, knowing that a railroad company has entered upon his land and is engaged in constructing its road without having complied with the statute in respect to condemnation, is estopped from thereafter maintaining either trespass or ejectment, but is limited to a recovery of compensation. *Roberts* v. *Northern Pacific Railroad,* 158 U. S. 1, 11 ; *Northern Pacific Railroad* v. *Smith,* 171 U. S. 260, and cases cited in the opinion.

The case, therefore, amounts to this : The plaintiffs alleged

that they were the owners of certain real estate bordering on the Savannah River; that the government, in the exercise of its powers of eminent domain and regulation of commerce, through officers and agents duly empowered thereto by acts of Congress, placed dams, training walls and other obstructions in the river in such manner as to hinder its natural flow and to raise its waters so as to overflow the land of plaintiffs, and overflow it to such an extent as to cause a total destruction of its value. The government, not denying the ownership of plaintiffs, admitted that the work which was done by their officers and agents was done by authority of Congress, but denied that those works had produced the alleged injury and destruction. We are of opinion that under these pleadings and the issues raised thereby the Circuit Court had jurisdiction to inquire whether the acts done by the officers of the United States under the direction of Congress had resulted in such an overflow and injury of the plaintiff's land as to render it absolutely valueless, and if thereby the property was, in contemplation of law, taken and appropriated by the government, to render judgment against it for the value of the property so taken and appropriated.

Was there a taking? There was no proceeding in condemnation instituted by the government, no attempt in terms to take and appropriate the title. There was no adjudication that the fee had passed from the landowner to the government, and if either of these be an essential element in the taking of lands, within the scope of the Fifth Amendment, there was no taking.

Some question is made as to the meaning of the findings. It appears from the fifth finding, as amended, that a large portion of the land flooded was in its natural condition between highwater mark and low water mark, and was subject to overflow as the water passed from one stage to the other; that this natural overflow was stopped by an embankment, and in lieu thereof, by means of flood gates, the land was flooded and drained at the will of the owner. From this it is contended that the only result of the raising of the level of the river by the government works was to take away the possibility of drainage. But findings nine and ten show that, both by seepage and

percolation through the embankment, and an actual flowing upon the plantation above the obstruction, the water has been raised in the plantation about eighteen inches, that it is impossible to remove this overflow of water, and, as a consequence, the property has become an irreclaimable bog, unfit for the purpose of rice culture or any other known agriculture, and deprived of all value. It is clear from these findings that what was a valuable rice plantation has been permanently flooded, wholly destroyed in value, and turned into an irreclaimable bog; and this as the necessary result of the work which the government has undertaken. Does this amount to a taking? The case of *Pumpelly* v. *Green Bay Company*, 13 Wall. 166, answers this question in the affirmative. And on the argument it was conceded by the learned counsel for the government (and properly conceded in view of the findings) that so far as respects the mere matter of overflow and injury there was no substantial distinction between the two cases. In that case the Green Bay Company, as authorized by statute, constructed a dam across Fox River, by means of which the land of Pumpelly was overflowed and rendered practically useless to him. There, as here, no proceedings had been taken to formally condemn the land. Referring to this it was said (p. 177):

"The argument of the defendant is that there is no *taking* of the land within the meaning of the constitutional provision, and that the damage is a consequential result of such use of a navigable stream as the government had a right to for the improvement of its navigation.

"It would be a very curious and unsatisfactory result, if in construing a provision of constitutional law, always understood to have been adopted for protection and security to the rights of the individual as against the government, and which has received the commendation of jurists, statesmen, and commentators as placing the just principles of the common law on that subject beyond the power of ordinary legislation to change or control them, it shall be held that if the government refrains from the absolute conversion of real property to the uses of the public it can destroy its value entirely, can inflict irreparable and permanent injury to any extent, can, in effect, subject it to

total destruction without making any compensation, because, in the narrowest sense of that word, it is not *taken* for the public use. Such a construction would pervert the constitutional provision into a restriction upon the rights of the citizen, as those rights stood at the common law, instead of the government, and make it an authority for invasion of private right under the pretext of the public good, which had no warrant in the laws or practices of our ancestors."

Reference was also made to the case of *Sinnickson* v. *Johnson*, 2 Harr. (17 N. J. Law) 129, in respect to which it was said: "The case is mainly valuable here as showing that overflowing land by backing the water on it was considered as 'taking' it within the meaning of the principle." Again, on page 179, it was said: "But there are numerous authorities to sustain the doctrine that a serious interruption to the common and necessary use of property may be, in the language of Mr. Angell, in his work on Water Courses, equivalent to the taking of it, and that under the constitutional provisions it is not necessary that the land should be absolutely taken." And in a foot-note the following authorities were cited: Angell on Water Courses, sec. 465a; *Hooker* v. *New Haven & Northampton Co.*, 14 Connecticut, 146; *Rowe* v. *Granite Bridge Corporation*, 21 Pick. 344; *Canal Appraisers* v. *The People*, 17 Wend. 571, 604; *Lackland* v. *North Missouri Railroad Co.*, 31 Missouri, 180; *Stevens* v. *Proprietors of Middlesex Canal*, 12 Massachusetts, 466.

It is clear from these authorities that where the government by the construction of a dam or other public works so floods lands belonging to an individual as to substantially destroy their value there is a taking within the scope of the Fifth Amendment. While the government does not directly proceed to appropriate the title, yet it takes away the use and value; when that is done it is of little consequence in whom the fee may be vested. Of course, it results from this that the proceeding must be regarded as an actual appropriation of the land, including the possession, the right of possession and the fee; and when the amount awarded as compensation is paid the title, the fee, with whatever rights may attach thereto—in this case those at least which belong to a riparian proprie-

tor—pass to the government and it becomes henceforth the full owner.

Passing to the third question, it is contended that what was done by the government was done in improving the navigability of a navigable river, that it is given by the Constitution full control over such improvements, and that if in doing any work therefor injury results to riparian proprietors or others it is an injury which is purely consequential, and for which the government is not liable. But if any one proposition can be considered as settled by the decisions of this court it is that, although in the discharge of its duties the government may appropriate property, it cannot do so without being liable to the obligation cast by the Fifth Amendment of paying just compensation.

In *Monongahela Navigation Company* v. *United States,* 148 U. S. 312, 336, it was said :

" But like the other powers granted to Congress by the Constitution, the power to regulate commerce is subject to all the limitations imposed by such instrument, and among them is that of the Fifth Amendment we have heretofore quoted. Congress has supreme control over the regulation of commerce, but if, in exercising that supreme control, it deems it necessary to take private property, then it must proceed subject to the limitations imposed by this Fifth Amendment, and can take only on payment of just compensation."

In that case Congress had passed an act for condemning what was known as " the upper lock and dam of the Monongahela Navigation Company," and provided " that in estimating the sum to be paid by the United States, the franchise of said corporation to collect tolls should not be considered or estimated," but we held that this proviso was beyond the power of Congress ; that it could not appropriate the property of the navigation company without paying its full value, and that a part of that value consisted in the franchise to take tolls. So in the recent case of *Scranton* v. *Wheeler,* 179 U. S. 141, 153, we repeated the proposition in these words :

" Undoubtedly compensation must be made or secured to the owner when that which is done is to be regarded as a taking

of private property for public use within the meaning of the Fifth Amendment of the Constitution; and of course in its exercise of the power to regulate commerce, Congress may not override the provision that just compensation must be made when private property is taken for public use."

It is true that a majority of the court held, in that case, that the destruction of access to land abutting on a navigable river by the construction by Congress of a pier on the submerged lands in front of the upland, was not a taking of private property for public uses, but only an instance of consequential injury to the property of the riparian owner. But the right of compensation in case of a taking was conceded. There have been many cases in which a distinction has been drawn between the taking of property for public uses and a consequential injury to such property, by reason of some public work. In the one class the law implies a contract, a promise to pay for the property taken, which, if the taking was by the general government, will uphold an action in the Court of Claims; while in the other class there is simply a tortious act doing injury, over which the Court of Claims has no jurisdiction. Thus, in *Transportation Company* v. *Chicago*, 99 U. S. 635, the city, duly authorized by statute, constructed a tunnel along the line of La Salle street and under the Chicago River. The company claimed that it was deprived of access to its premises by and during the construction. This deprivation was not permanent, but continued only during the time necessary to complete the tunnel, and it was held that there was no taking of the property, but only an injury, and that a temporary injury thereto. In the course of the opinion, after referring to the *Pumpelly* case, *supra*, and *Eaton* v. *Boston, Concord & Montreal Railroad Company*, 51 N. H. 504, we said (p. 642):

" In those cases, it was held that permanent flooding of private property may be regarded as a 'taking.' In those cases there was physical invasion of real estate of the private owner, and a practical ouster of his possession. But in the present case there was no such invasion. No entry was made upon the plaintiff's lot. All that was done was to render for a time its use more inconvenient."

*Chicago* v. *Taylor*, 125 U. S. 161, while recognizing and re-affirming the rule there laid down, was decided upon the ground that a new rule was established by the Illinois consti-tution of 1870, which provided that "private property shall not be taken or damaged for public use without just compensa-tion." *Montana Company* v. *St. Louis Mining &c. Company*, 152 U. S. 160, held that a mere order for inspection of mining property was not a taking thereof, because all that was done was a temporary and limited interruption of the exclusive use. *Gibson* v. *United States*, 166 U. S. 269, decided that, where by the construction of a dyke by the United States in the improve-ment of the Ohio River the plaintiff, a riparian owner, was through the greater part of the gardening season deprived of the use of her landing for the shipment of products from and supplies to her farm, whereby the value of her farm was reduced $150 to $200 per acre, there was no taking of the property, but only a consequential injury. See also *Marchant* v. *Pennsylva-nia Railroad*, 153 U. S. 380; *Meyer* v. *Richmond*, 172 U. S. 82. In this connection *Mills* v. *United States*, 46 Fed. Rep. 738, decided in the District Court for the Southern District of Georgia, is worthy of notice by reason of its similarity in many respects and its clearly marked distinction in an essential mat-ter. It was an action for injuries to a rice plantation on the banks of the Savannah River resulting from works done by the United States in improving the navigability of that river, ap-parently the very improvement made by the government in the present case. The condition of the claimant's rice plantation prior to the improvement was substantially that of these plain-tiffs' property, and the lands were drained by opening the gates when the river was at low water mark. The complaint was that the erection by the government of what was called the "cross tides dam," running from the upper end of Hutchinson's Island to the lower end of Argyle Island, cut off all the flow of water from the stream connecting the front and back rivers, raised both the high and low water levels in the front river, and not only destroyed the facilities for draining these lands into the front river, but rendered it necessary to raise the levees around the rice fields, to prevent flooding the fields at high

water.   This, it was alleged, unfitted the lands for rice culture and made it necessary that new drainage into back river be provided where the water levels were suitable.   Obviously, there was no taking of the plaintiff's lands, but simply an injury which could be remedied at an expense as alleged of $10,000, and the action was one to recover the amount of this consequential injury.   The court rightfully held that it could not be sustained.   Here there is no finding, no suggestion, that by any expense the flooding could be averted.   We may, of course, know that there is theoretically no limit to that which engineering skill may accomplish.   We know that vast tracts have in different parts of the world been reclaimed by levees and other works, and so we may believe that this flooding may be prevented, that some day all these submerged lands may be reclaimed.   But as a practical matter, and for the purposes of this case, we must under the findings regard the lands in controversy as irreclaimable and their value wholly and finally destroyed.

Therefore, following the settled law of this court, we hold that there has been a taking of the lands for public uses and that the government is under an implied contract to make just compensation therefor.

The judgment is

*Affirmed.*

Mr. Justice Brown concurring.

I concur in the opinion of the court both with respect to its jurisdiction and the merits of the case, but I am unable to assent to the ground upon which our jurisdiction is rested.   While I think the overflowing of the lands in controversy constitutes a taking within the meaning of the Fifth Amendment to the Constitution, I see no reason for holding that there was an implied contract to pay for them within the meaning of the Tucker act.   The taking appears to me an ordinary case of trespass to real estate, containing no element whatever of contract.   In such case there can be no waiver of the tort.   *Jones* v. *Hoar*, 5 Pick. 285 ; *Smith* v. *Hatch*, 46 N. H. 146.

But I think our jurisdiction may be supported, irrespective of the question of contract or tort, under that clause of the Tucker act which vests the Court of Claims with jurisdiction of "all claims founded upon the Constitution of the United States or any law of Congress."

As we had occasion to remark in *Dooley* v. *United States*, 182 U. S. 222–224, the first section of the Tucker act evidently contemplates four distinct classes of cases: (1) those founded upon the Constitution or any law of Congress, with an exception of pension cases; (2) cases founded upon a regulation of an Executive Department; (3) cases of contract, express or implied, with the government; (4) actions for damages, liquidated or unliquidated, in cases *not sounding in tort.* The words "not sounding in tort" are in terms referable only to the fourth class of cases.

In my view, claims founded upon the Constitution may be prosecuted in the Court of Claims, whether sounding in contract or in tort; and wherever the United States may take proceedings in eminent domain for the condemnation of lands for public use, the owner of such lands may seek relief in the Court of Claims if his lands be taken without such proceedings, whether such taking be tortious or by virtue of some contract, express or implied, to that effect. That the case under consideration is one of that class is made clear by the act of April 24, 1888, 25 Stat. 94, which enacts "that the Secretary of War may cause proceedings to be instituted, in the name of the United States, in any court having jurisdiction of such proceedings, for the acquirement by condemnation of any land, right of way, or material needed to enable him to maintain, operate or prosecute works for the improvement of rivers and harbors for which provision has been made by law; such proceedings to be prosecuted in accordance with the laws relating to suits for the condemnation of property of the States wherein the proceedings may be instituted."

I fully concur in the opinion of the court that "the government may take real estate for a post office, a court house, a fortification or highway, or in time of war it may take merchant vessels and made them part of its naval force," but this cannot

be " done without an obligation to pay for the value of that which is so taken and appropriated." I am also of opinion that whenever in the exercise of its governmental rights it takes property, the ownership of which it concedes to be in an individual, it is bound to pay therefor, but I do not think that there is any distinction between cases where the government impliedly promises to pay by taking property with the assent of the owner, and those where it takes property forcibly and against the will of the owner. It does not seem reasonable to hold that, where the invasion of the owner's right to property is the greater, his remedy for the recovery of its value should be less, and that he should be compelled to resort to the tedious and unsatisfactory method of appealing to the bounty of Congress for relief.

Suppose, for instance, in time of war and under threat of invasion it seizes upon vessels without the consent of the owner and against his protest. There is certainly the same moral obligation to pay for them as if they had been appropriated with his consent, and I see no reason why an action for their value may not be maintained in the Court of Claims. Yet, as I understand the opinion of the court in this case, it holds indirectly, if not directly, that no such action would lie unless the property were taken with the consent of the owner and under an implied contract to pay for it. The consequences of recognizing such distinctions seem to me so serious that nothing short of clear language in the statute will justify it.

None such is even hinted at in *United States* v. *Russell*, 13 Wall. 623, one of the earliest cases, wherein the owner of three steamers seized under " imperative military necessity " sought to recover compensation for their services. These steamers were impressed into the public service and employed as transports for carrying government freight for a certain length of time, when they were returned to the owner. He was held entitled to recover, the court holding that " extraordinary and unforeseen occasons arise, however, beyond all doubt, in cases of extreme necessity, in time of war or of immediate and impending public danger, in which private property may be impressed into the public service, or may be seized and appropriated to the public

use, or may be even destroyed without the consent of the owner." The case followed that of *Mitchell* v. *Harmony*, 13 How. 115, and was distinguished from that of *Filor* v. *United States*, 9 Wall. 45.

While the cases reported prior to 131 U. S. are based upon the original Court of Claims act, which limited the jurisdiction of that court to "claims founded upon any law of Congress, or upon any regulation of an Executive Department, or upon any contract, express or implied, with the government of the United States," and are therefore not strictly pertinent under the Tucker act, that of the *Great Falls Manufacturing Co.*, 112 U. S. 645, is almost exactly in point, and is strongly corroborative of the position here taken. This was a claim for land taken at the Great Falls of the Potomac in the construction of an aqueduct for bringing water to Washington. Proceedings were taken in Maryland for condemnation, which were discontinued, and the government took possession of the land. Whether such possession was taken with or without the consent of the owner does not appear, although there had been negotiations between the parties. The claimant was held to be entitled to recover upon the ground that the appropriation of the money for the construction of the improvements was equivalent to an express direction by Congress to take this particular property for the objects contemplated by the scheme, and that there was no sound reason why the claimant might not waive any right he might have to an injunction, and elect to regard the action as a taking by the government under its sovereign right of eminent domain, and therefore demand compensation. The case was not put upon the ground that the owner had consented to the taking.

In *Langford's* case, 101 U. S. 341, the action was brought to recover for the use and occupation of certain lands and buildings to which the claimant asserted title, which were seized for the use of the government under claim that they were public property. It was admitted that if the government takes property for public use, acknowledging its ownership to be private or individual, there arises an implied obligation to pay the owner its value; but that it was a different matter when the govern-

ment claimed the property as its own and recognized no superior title. This was also the case in *Hill* v. *United States*, 149 U. S. 593, where the government erected a lighthouse upon submerged land which it claimed as its own. The case was held to be governed by that of *Langford*.

None of the more recent cases under the Tucker act conflicts with the position here taken : That wherever the United States may proceed to condemn property under its sovereign right of eminent domain, the owner may maintain a petition in the Court of Claims to recover its value, in case no such proceedings are taken. That act, 24 Stat. 505, first introduced among the cognizable claims all such as were founded upon the Constitution of the United States, and also introduced, after the words "for damages, liquidated or unliquidated," the words "in cases not sounding in tort." Construing this statute, it was held in the *Jones* case, 131 U. S. 1, that it did not confer jurisdiction in equity to compel the issue and delivery of a patent for public land ; and in *Schillinger's* case, 155 U. S. 163, that the owner of a patent which had been infringed by the United States could not recover damages for such infringement in the Court of Claims, though it would be otherwise if the property had been appropriated with the consent of the patentee and in view of compensation therefor. Although there was in *Schillinger's* case an appropriation of the right of a patentee to the monopoly of his invention, the case was nothing more in its essence than the infringement of a patent, and so the action was really one for damages sounding in tort. While it is possible an individual might be able to condemn the patentee's right by proceedings in eminent domain, that remedy would be at least doubtful, when the government sought merely to appropriate so much of it as was necessary for its own use. It would be an unprecedented exercise of the right of eminent domain, and could scarcely be held to be a claim arising under the Constitution. The case was not put upon the ground that it was such a case, but that it was merely an action to recover damages for infringement. Said the court : "It was plainly and solely an action for infringement and one sounding in tort." The question whether it was a claim arising under the Constitution was not

considered, except in the dissenting opinion of Mr. Justice Harlan, who said : " The constitutional obligation cannot be evaded by showing that the original appropriation was without the express direction of the government, nor by simply interposing a denial of the title of the claimant to the property or property rights alleged to have been appropriated." If there were any doubt in that case of the power of the government to condemn the right of the patentee by proceedings in eminent domain, there is certainly none such in this case, where the land was taken by the government with no pretence of consent by the owner.

I think it is going too far to hold that the words of the Tucker act, "not sounding in tort, " must be referred back to the first class of cases, namely, " those founded upon the Constitution," and that they should be limited to actions for damages, liquidated or unliquidated, and, hence, the consent of the owner cuts no figure in this case. I freely admit that, if property were seized or taken by officers of the government without authority of law, or subsequent ratification, by taking possession or occupying property for public use, there could be no recovery, since neither the government nor any other principal is bound by the unauthorized acts of its agents. But in endeavoring to raise an implied contract- to pay for an ordinary trespass to real estate I think the opinion of the court misconceives the true source of our jurisdiction.

MR. JUSTICE SHIRAS and MR. JUSTICE PECKHAM concurred in the above opinion in so far as it holds that the court had jurisdiction on the ground stated therein, as well as upon the ground stated in the opinion of the court.

MR. JUSTICE MCKENNA took no part in the decision of this case.

MR. JUSTICE WHITE, with whom concur MR. CHIEF JUSTICE FULLER and MR. JUSTICE HARLAN, dissenting.

The court now holds that it has jurisdiction, because as a

legal conclusion from the findings of fact it is held that the property of the appellee has been taken for public use by the United States, and the judgment below is affirmed on the merits for the same reason. As, in my opinion, the findings of fact do not support the conclusion that the property has been taken by the United States, I dissent both on the subject of jurisdiction and on the merits.

The findings of fact are in most respects sufficiently reproduced in the opinion of the court, and need not here be set out in full. It results from the findings that the land is situated on the Savannah River; that it is between high and low water mark, and naturally subject to be overflowed, but that it is protected in some measure from overflow by an embankment, and that through this embankment sluices or waterways were placed, by means of which water was let in on the land for irrigation in the cultivation of rice, and was drawn off when the land was required to be drained in order to carry on the same culture. This was done by gates in the sluices, which were opened to allow the water to flow through the waterways to the inner side of the embankment and thus flood the land when it was requisite to do so, and by opening the gates at low tide to allow the water to flow off when it was required to drain the land. As the exact situation of the waterways through the embankment is important, I reproduce the statement on the subject contained in the findings:

"Through this embankment trunks or waterways were constructed, with flood gates therein. The outer opening of the trunk was 'bout a foot or a little less above the mean low water mark of the river, in which the tide ebbs and flows. When it is desired to flow the lands the flood gates are opened and the water comes in. When it is desired to draw off this water and to effect the drainage of the lands, the flood gates are opened at low water and the water escapes. It is essential that the outlets of the trunks or waterways should be above the mean low watermark."

It is now decided that there has been a taking of the property by the United States, because it is thought that the findings establish that the obstructions placed by the government

in the bed of the river at a point lower down the stream, than is the plantation, for the purpose of improving the navigation of the river, have so raised the water as to cause it to flow over the embankment at the plantation and flood the same, thus destroying its value. On this subject the court says: "Findings nine and ten show that, both by seepage and percolation through the embankment, and *an actual flowing upon the plantation* above the obstruction, the water has been raised in the plantation about eighteen inches," etc. Whilst it is not disputable that the findings show a percolation through the embankment I can discover nothing in them supporting the conclusion that the obstructions placed by the government in the bed of the river below the point where the plantation is situated have caused the water in the river to go over the embankment at the plantation and flood the land. On the contrary, to me it seems that the findings necessitate the conclusion that the permanent damage which the property has suffered arises solely from the fact that the drainage of the plantation into the river has been rendered impossible. And this because the work done by the government has resulted in raising the mean low tide about twelve to fifteen inches, so as to cause the water in the river at mean low tide to be above the point of discharge of the waterways, thus rendering drainage through them no longer possible. There may be a wide legal difference arising from damage consequent on an interference with the drainage of property situated, as this is, by work done by the government in the improvement of navigation, and damage caused by the actual flooding of such property resulting from such work. To determine whether the findings show an actual flowing, or a mere injury to drainage, findings VIII, IX and X need to be considered. Let us see whether they give support to the claim of actual flooding by an overflow of the embankment at the plantation. Finding VIII says:

"VIII. In thus improving navigation of this navigable water the United States has built and maintained and is now building and maintaining in and across the Savannah River, in the bed thereof, certain dams, training walls and other obstructions, obstructing the natural flow of said river in and along its nat-

ural bed, and so raising the level of said river above said obstructions, and causing its waters to be kept back and to flow back, and to be elevated above its natural height in its natural bed."

Certainly there is nothing in this finding supporting the inference that the government work has caused the river to overflow the plantation embankment.   Finding IX says :

" This rice plantation Vernezobre is above these obstructions. The direct effect thereof is to raise the level of the Savannah River at this plantation, and to keep the point of mean low water above its natural point, so that the outlet of the trunks and waterways above spoken of in the bank of said plantation, instead of being above this point of low water mark, is now below this point."

Here, then, is the statement that the effect resulting from the government work was simply to raise the mean low water mark as previously existing, so as to cause it to cover the waterways which were—as declared by the previous finding— a little less than a foot above the former low water mark.   The finding continues :

" Another direct result was that by seepage and percolation the water rose in the plantation until the water level in the land gradually rose to the height of the increased water level in the river, and the superinduced addition of water in the plantation was about eighteen inches thereby.   By reason of this it gradually became difficult, and has now become impossible, to let off the water on this plantation, or to drain the same, so that these acres dedicated to the culture of rice have become boggy, unfit for cultivation, and impossible to be cultivated in rice."

This but declares that because the mean low stage of the water had been raised by the government work so as to cause it to be about eight inches above the mouth of the waterways and to rest against the embankment about eighteen inches, that percolation took place and the drainage was destroyed, the result of the loss of drainage being to render the plantation a bog and no longer suitable for the cultivation of rice.   It is submitted nothing in the findings hitherto referred to even in-

timate that the effect of the work of the government caused the water to flow over the embankment and flood the plantation. On the contrary, the very opposite is the result of the findings.

Let me next consider the tenth finding. It reads as follows:

"By the raising of the level of the Savannah River by these dams and obstructions the water thereof has been backed up against the embankment on the river and has been caused to flow back upon and in this plantation above the obstruction, and has actually invaded said plantation, directly raising the water in said plantation about eighteen inches, which it is impossible to remove from said plantation."

Now, the flowing described here can only relate to the seepage and percolation referred to in the previous finding. The words "above the obstructions" relate not to the embankment on the plantation, but to the obstructions put in the bed of the river by the government below the point where the plantation is situated; and, therefore, what the finding means is that above this obstruction the water is caused to flow back against, not over the embankment, as described in the previous finding. And this finding shows besides that it was the impossibility of removing the water which percolated or was the result of rain fall—in other words, the injury to the drainage—which was the cause of the damage.

Thus eliminating all question of the flooding of the land by the overflow of the embankment, the question for decision is this: When a plantation or a portion thereof is situated on the bank of a navigable river, below high water mark, and because of such situation is dependent for its profitable operation upon drainage into the river at mean low tide, does the United States appropriate the property by the simple fact that in improving the navigation of the river it raises the mean low tide slightly above the height where it was wont theretofore to be, and by reason of which the drainage of the land below high water mark is destroyed. It seems to me to state this question is to answer it in the negative. The owner of the land situated below high water mark acquired no easement or servitude in the bed of the river by the construction of an embankment along

the margin of his land at the river below high water, by which he could forever exact that the level of the water within the natural banks of the river could never be changed without his consent, and thus deprive the United States of its control over the improvement of navigable rivers conferred by the Constitution. If damage, by the loss of drainage, into the river at mean low tide of land so situated was caused by the lawful exercise by the United States of its power to improve navigation it was *damnum absque injuria*, and redress must be sought at the hands of Congress and cannot be judicially afforded by a ruling that a damage so resulting constitutes a taking of the property by the United States and creates an implied contract to pay the value of the property. Such a doctrine is directly— as I see it—in conflict with the decisions of this court in *Gibson* v. *United States*, 166 U. S. 269, and *Scranton* v. *Wheeler*, 179 U. S. 141. The far-reaching consequence of the doctrine now announced cannot be overestimated.

But even under the hypothesis that the government work caused the land to be overflowed by raising the water above the embankment, I do not conceive that there would be a taking, even in that case, of the property, for a remedy would be easily afforded for any permanent injury to the land by raising the embankment. The quantum of damages would thus not be the value of the property, but the mere cost of increasing the height of the embankment so as to prevent the water from flowing over it. The fact then that a taking is now held to exist, and therefore the United States is compelled to pay the value of the entire property, submits the United States, in the exercise of a power conferred upon it by the Constitution, to a rule which no individual would be subjected to in a controversy between private parties. Nor is this answered by the suggestion that there is a taking because the paying by the United States of the sum of money necessary to raise the level of the embankment so as to prevent the overflow would not compensate the owner, as the property would still be worthless because of the want of drainage. To so suggest is but to admit that the damage complained of results from the inability to drain the land, which, for the reasons already pointed out does not in my opinion constitute a taking.

Indeed, the reasoning hitherto indicated as to the assumed overflow of the embankment is equally apposite to the damage by loss of drainage. For injury to the drainage the remedy would be readily afforded by, if possible, draining the plantation elsewhere than into the river, or by resort to the pumping appliances necessary to lift out the water accumulating from rainfall or percolation. The cost of doing these things would then be the measure of damages. That a resort to these simple expedients is unavailing as to this particular property because of its being situated below high water mark does not, I submit, show that the government has taken the property for public use, but simply establishes that the property is so situated that it is subjected to a loss necessarily arising from the fact that it is below high water mark and therefore absolutely dependent for its drainage on the right of the owner to exact that the mean low tide of the river should be forever unchanged. As the right to so exact does not exist, the loss of drainage does not constitute an appropriation of the property by the United States, and is but the result of the natural situation of the land. If equities exist Congress is alone capable of providing for them.

I am authorized to say that the CHIEF JUSTICE and MR. JUSTICE HARLAN concur in this dissent.

UNITED STATES *v.* WILLIAMS. No. 59. Error to the Circuit Court of the United States for the District of South Carolina.

This case is in all substantial respects similar to the one just decided, and for the reasons given in the opinion therein the judgment is

*Affirmed.*

For the reasons stated in their dissenting opinion in the prior case, the CHIEF JUSTICE, MR. JUSTICE HARLAN and MR. JUSTICE WHITE dissent also in this case.

MR. JUSTICE MCKENNA took no part in the decision of this case.