Peelle, Ch. J.,
delivered the opinion of the court:
This action involves the question whether the overflow of the lands of the claimant’s testator during stages of high water, superinduced by the wave and current resulting from the dam constructed by the Government across the Kanawha River at Lock No. 3, is a taking within the meaning of the fifth amendment of the Constitution.
What constitutes a taking under the fifth amendment of the Constitution has been so often defined by the Supreme *81 Court and by this court that it would be a work of repetition to review the authorities, nevertheless we will refer to some of them. In the case of Lynah (188 U. S., 445, 464) the court, after reviewing the leading authorities on the subject, said :
“The rule deducible from these cases is that when the Government appropriates property which it does not claim as its own it does so under an implied contract that it will pay the value of the property so appropriated. * * * Whenever in the exercise of its governmental rights it takes property, the ownership of which it concedes to be in an individual, it impliedly promises to pay therefor.” And though there may be no direction by statute to take any particular property, yet if the taking results from the doing of that which is authorized it will be a taking within the meaning of the fifth amendment of the Constitution. Such was the holding in the case of United States v. Great Falls Manufacturing Co. (112 U S., 645, 658); Juragua Iron Co. v. United States (212 ibid., 297, 303). However, to constitute a taking, there must be an appropriation of the land, a physical invasion, whereby the owner is deprived of the use and enjoyment of his land or its value is thereby practically destroyed, before a contract can be implied to make compensation therefor. And the taking must be distinguished from damage, for, as observed by the court in the case of Bedford v. United States (192 U. S., 217, 224), “the Constitution provides that private property shall not be taken without just compensation, but a distinction has been made between damage and taking, and that distinction must be observed in applying the constitutional provision.”
It is not enough that the damage results incidentally to the land by reason of the authorized acts of the Government, for, in the case of Union Bridge Co. v. United States (204 ibid., 364, 396), where the authorities on the subject are again elaborately reviewed, the court said: “If the injury complained of is only incidental to the legitimate exercise of governmental powers for the public good, then there is no taking of property for the public use, and a right to compensation, on account of such injury, does not attach under the Constitution.” And so in the case of Transportation Company v. Chicago (99 U. S., 635-642), referring to the restriction in the Constitution that private property shall not be taken for public use, the court said: “ But acts done in the proper exercise of governmental power and not di *82 rectly encroacbing upon private property, though their consequences may impair its use, are universally held not to be a taking within the meaning of the constitutional provision. They do not entitle the owner of such property to compensation from the state or its agents, or give him any right of action. This is supported by an immense weight of authority.” See authorities collated in Cooley on Constitutional Limitation, page 542, and notes.
If, therefore, the land is merely damaged by the impairment of its use or value as an incidetnal consequence of the lawful exercise of power by the Government, there is no taking under the authorities cited.
The leading case on the subject of a taking by overflow is that of Pumpelly v. Green Bay Co. (13 Wall., 166, 177). In that case the overflow resulted from the construction in 1861 of a dam across Fox River, the northern outlet of Lake Winnebago, whereby the waters of the lake, in violation of the act authorizing the construction of the dam, were raised so high as to overflow the land and continued to overflow it until the bringing of the suit in 1867,
In response to the contention of the defendants that there was no taking and that the damage to the land was consequential, the court said:
“ It would be a very serious and unsatisfactory result, if in construing a provision of constitutional law, always understood to have been adopted for protection and security to the rights of the individual as against the Government, and which has received the commendation of jurists, statesmen, and commentators as placing the just principles of the common law on that subject beyond the power of ordinary legislation to change or control them, it shall be held that if the Government refrains from the absolute conversion of real property to the uses of the public it can destroy its value entirely, can inflict irreparable and permanent injury to any extent, can, in effect, subject it to total destruction without making any compensation, because, in the narrowest sense of that word, it is not taken for the public use. Such a construction would pervert the constitutional provision into a restriction upon the rights of the citizen, as those rights stood at the common law, insead of the Government, and make it an authority for invasion of private right under the pretext of the public good which had no warrant in the laws or practices of our ancestors.”
*83 Likewise in the case of Lynah (supra) the overflow resulted from the construction of dams and training walls in and across the Savannah River, whereby the natural flow of the river was obstructed and the water therein raised above its natural height.
Without further reference to authorities, it may now be regarded as settled law that where land is overflowed and its value destroyed through the authorized acts of the Government in the improvement of navigation it is a taking within the meaning of the Constitution as construed by the Supreme Court.
In the present case there can be no question that but for the high water there would have been no overflow; and equally true it is that but for the dam the wave and current resulting therefrom would not have been sufficient to destroy the river bank. Therefore we have presented the question whether the high -water from natural causes, coupled with the authorized acts of the Government in constructing the dam, both of which contributed to the overflow and consequent destruction in value of the testator’s land, can be made the basis of a talcing so as to imply a contract to pay therefor.
True, as observed by the court in the Gibson case (supra), “ riparian ownership is subject to the obligation to suffer the consequences of the improvement of navigation in the exercise of the dominant right of the Government in that regard.” There, however, the land was only impaired in value by the cutting off of the riparian owner’s right of access to the river for the transportation and sale of his farm products. There was no physical invasion.
In the Bedford case (supra) the land was flooded as an incidental consequence of a revetment constructed by the Government along the bank of a river to prevent erosion of the bank from natural causes and to thereby hold the river in its natural course. The court held that the overflow was consequential and that no right could be founded on the unrestrained operation of natural causes.
In the Walls case (44 C. Cls., 482) the level of the river was raised by the construction of a lock and dam in the Mo-nongahéla River, thereby causing the water to flow over and *84 upon the owner’s land, and the Government was held liable. There the court stated the whole case to be that “ before the construction of the lock all of the claimant’s land had on two or three occasions been overflowed and he was compelled to abandon his residence until the water receded. Since the construction of the lock, and as a direct result thereof, acres of the land have been permanently submerged, while the residue of the 5-acre tract is more liable to overflow in times of freshets; but such overflows so caused by freshets are not of such frequency as to amount to a taking of said land, even if the United States were liable therefor; nor is access thereto cut off by reason of the submerged land; hence it can not be held that such occasional overflows are the direct result of the construction of the lock, as the raising of the level of the water by said construction was in submerging the 2^ acres.”
Here the whole case is this: Before the construction of the lock and dam the land was overflowed at stages of high water and to some extent the wave and current washed away the river bank, but the bank remained substantially the same, without any noticeable encroachment by the river. Soon after the construction of the lock and dam the high water so washed the banks of the river as to threaten a destruction of the testator’s land as well as the channel of the river. The officers of the War Department were advised of this action of the water and were asked to take steps to prevent the land from further washing. In 1893 some work looking to that end was done by the construction of a wall to break the force of the current, but during the high water in 1897, superinduced by the wave and current resulting from the dam, the bank broke and the testator’s land was flooded, and the current cut a deep gully through his land. Thereafter the dam so constructed in 1893 was repaired from time to time, by reason of the breaks which occurred therein from the high waters the preceding winters, and in 1903 a wall of stone, laid dry, was built by the Government to further break the force of the wave and current during stages of high water, and while the same appears sufficient therefor, it was not sufficient to prevent overflowing on the testator’s land.
*85 Prior to the break in 1897 a part of the bank had been washed away, and since that time the action of the water has continued and a considerable portion of the testator’s land has been entirely washed away and its value entirely destroyed.
The court therefore concludes that while the mediate or predisposing cause of the flooding of testator’s land was by reason of the high water, the immediate and dominant cause, without which the river bank would not have broken, was the action of the water resulting from the dam. That is to say, during such times the water flowed over the dam against the bank with greater force than it would have done but for the dam, and for that reason the bank was broken and the water flowed over and upon the testator’s land, cutting a deep gully through it.
The 3 acres of land washed over and away, as well as the quantity of land in the gully, as set forth in Findings YII and Y III, were thereby rendered unfit for agricultural purposes ; and while it is by no means clear to the court that such washing and occasional overflows resulting from the dam constitute a taking as distinguished from consequential damages, still as the land so washed has deprived the owner— who expended a considerable sum of money in trying to prevent such overflows — from cultivating the same or utilizing the land for building purposes, we hold that the same was taken by the invasion and action of the water as the direct result of the dam, and to that extent a contract is implied to make compensation therefor.
But in respect to the land between the gully and the river, as set forth in Finding IX, the same has been cultivated most of the time since the breaking of the dam in 1897, and whatever damage results thereto arises from its risk to overflow, and may, therefore, be regarded as consequential. And the same is true as to the 3 acres of land referred to in Finding X. In other words, we confine recovery in the case to the land actually invaded and washed away, including the quantity in the gully, amounting to 6t8<j acres, the reasonable value of which is $200 per acre, or $1,360.
*86 Oí course there can be no recovery for the money expended by the claimant’s testator set forth in Finding V, as whatever money he expended was for the protection of his own property, and it is by no means clear that as riparian owner he was not obligated to expend the money he did, if not more, to prevent the overflow upon his land. Certainly there was no taking by the Government, although by its lawful act he may have been compelled to expend the money he did, not for the benefit of the Government, but for his own protection.
For the reasons we .have given judgment is ordered to be entered for the claimant on Findings YII and VIII in the sum of $1,860.