### UNITED STATES v. WABASHA–NELSON BRIDGE CO.

No. 5603.

Circuit Court of Appeals, Seventh Circuit.

April 7, 1936.

A. C. Wiprud, of Minneapolis, Minn., John J. Boyle, of Darlington, Wis., Daniel F. Steck, of Ottumwa, Iowa, John J. Courtney, of St. Paul, Minn., and John T. Harrington, of Madison, Wis., for the United States.

John W. Murdoch and Harold J. Alton, both of Wabasha, Minn., for appellee.

Before EVANS and SPARKS, Circuit Judges, and BALTZELL, District Judge.

BALTZELL, District Judge.

On October 16, 1933, the United States of America (hereinafter referred to as "the government") filed an amended petition in the District Court, wherein it sought to condemn certain lands and easements in Buffalo county, Wis. The lands and easements thus sought to be condemned are to be used in the construction, maintenance, and operation of what is known as "Lock and Dam No. 4" in the Mississippi river. It is the purpose of the government to maintain at all times a 9-foot navigation channel in the Mississippi river, between the mouth of the Illinois river and the Twin City Dam. In order that a channel of this depth may be maintained it is necessary that a flowage easement up to an elevation of 667 feet above mean sea leved datum (1912 adjustment) over, across, and through the lands and easements described in the amended petition be acquired by the government. A part of appellee's right of way in question is included in the land sought to be condemned.

It is stipulated that, after the institution of these proceedings, an order was entered granting condemnation and appointing commissioners who proceeded to determine the compensation due appellee; that such commissioners filed their report with the District Court wherein an award of $9,680 was made. An appeal was taken by the government to the District Court, a trial had to a jury, and, after the return of both a general and special verdict in favor of appellee, judgment in the sum of $4,443, with interest thereon from April 1, 1935—the date of the completion of the dam—was duly entered. The govern-

ment is now prosecuting this appeal from said judgment.

At the conclusion of the trial, the government moved for a directed verdict in favor of appellee in the sum of $1 for the land condemned. This motion was overruled by the court, and such ruling is assigned as error and relied upon for reversal. In fact, the government, in its original brief, relies entirely upon this particular assignment of error, saying: "The government does not deem the record sufficient to properly present an issue on the proper rule of damages, and consequently waives that question. We rely, in other words, solely upon the motion for a directed verdict and the reasons assigned therefor." In its supplemental brief, however, it assumes a somewhat different position, devoting such brief to "a consideration of the measure of compensation applying to the situation disclosed by the record." The question first to be determined, therefore, is whether there has been, in fact, a "taking" under the Fifth Amendment to the Constitution, so as to entitle appellee to compensation therefor.

By enactments of Congress, the government was authorized to construct at Alma, Wis., what is commonly known as Lock and Dam No. 4, which will serve to maintain at all times a 9-foot navigation channel in the Mississippi river, extending from the Illinois river to Minneapolis, Minn. About 7 miles upstream from this dam appellee had constructed a bridge across the Mississippi river in the year 1930, which bridge was opened to the public for traffic early in the year 1931. It was constructed pursuant. to congressional authority; the floor thereof being much higher than the surface of the ground at its extreme abutment on the Wisconsin side. This situation necessarily required the construction of an approach or embankment across this low land for a considerable distance; in fact, it was necessary to extend this approach or embankment a distance of some 12,300 feet to the tracks of the Chicago, Burlington & Quincy Railroad Company at the village of Nelson, which connected the bridge with Wisconsin state highway No. 35. Appellee's right of way was 200 feet wide, extending from the Wisconsin side of the river to the village of Nelson, a part only of which was owned by it. In the construction of this approach or embankment a dragline excavator was placed upon the original ground, in center of the right of way, and soil was scooped up from each side thereof and used to build the embankment. The width of the embankment was 70 feet at the base, 30 feet at the top, and 28 feet between the guard rails of the roadway. The center of the completed roadway was one foot higher than the edges; that is, the center was at an elevation of approximately 677 feet above mean sea level and the edges at 676 feet. The property of appellee, as represented by the right of way, approach, and embankment, is the property in which we are interested in this proceeding. Upstream therefrom is the Chippewa river, which sometimes overflows, and to relieve the embankment from the damaging effect of the pressure, waves, etc., four bridges are constructed along the right of way. They are constructed at a floor elevation of 676 feet, and each is 100 feet in length. By the use of the dragline method in the construction of the embankment, borrow pits or ditches are created along each side thereof. These borrow pits or ditches extend the entire length of the roadway, and are approximately 65 feet in width. Their depth, however, is not uniform.

Before beginning the construction of the roadway, it became necessary to determine the height of the embankment supporting such roadway. An investigation was made with respect to floods of the past, the height to which the water would rise at such times, etc. It was determined that an elevation of 677 feet for the center of the roadway and 676 feet for its edges was sufficient to meet any emergency. It was also determined that an ordinary high-water stage would not exceed an elevation of 665 or 666 feet; thus leaving a vertical spread of 10 to 11 feet at the time of an ordinary high water. The natural flow of the water at such times would contact the embankment at this elevation, but would fluctuate and not remain the same at all times. During many months of the year the water level would, of course, be much lower than that elevation. Because of the different elevations of the land adjacent to appellee's right of way, the water, at an elevation of 667 feet, the flowage easement of the government, does not contact the embankment of the roadway throughout its entire length. It will, however, contact it at various places and will tend to cause the water in the borrow pits throughout its

854

entire length to be elevated. At the places where direct contact is had, or where the land of appellee is directly invaded, the water will remain at a level of at least one foot higher upon the embankment than it would if the dam had not been constructed and the flowage easement established. It is clear, therefore, that such easement does encroach upon the property of appellee. Is this sufficient to constitute a "taking" under the Constitution? That is the question.

It is the government's contention that appellee is entitled to only nominal damages, and in its motion for a directed verdict it was asked that the jury be directed to return a verdict in the sum of $1 only. It is further contended that appellee should receive nothing for any damages that may result to any of its adjoining property, but should be limited strictly to that actually flooded or invaded. If the government's action, in establishing a flowage easement over and against the property of appellee, amounted to a "taking" of such property, it is, under the Fifth Amendment, entitled to just compensation for the property thus taken. There is no question but that appellee continues to use the roadway the same since the establishment of the flowage easement as it did prior thereto. Neither is there any question, under the evidence, but that additional expense will be required to maintain it in the same condition as before the establishment thereof. It cannot be said that a small portion of an embankment supporting a roadway may be saturated with water and not, in some degree, affect the surface thereof, especially where the surface is only a few feet above the part thus saturated. The embankment upon which the surface of the roadway rests was constructed for one purpose only, and that was to maintain and support a roadway upon which the traveling public may reach the bridge theretofore erected by appellee across the Mississippi river. In other words, this roadway connects a public highway (known as Wisconsin state highway No. 35) and the bridge, and it is their only connection. If any part or section of the embankment supporting the roadway is destroyed by the flowage easement, the value of the entire roadway is destroyed; that is to say, it is necessary that the entire roadway—12,300 feet—be kept in repair and open to the traveling public in order to be of value to appellee. Therefore the encroachment upon the embankment by the flowage easement, even though in only a few places, does, in a manner, affect the adjoining part of the embankment. Certainly, by capillary attraction, it affects several feet of earth lying immediately above the water line. The evidence is that it will affect such embankment for at least 5 feet above such line. This will naturally affect the surface of the roadway, especially during the long and cold winter months of this region. The expenditure of additional time and money for the maintenance of this roadway will continue indefinitely, as the construction of the lock and dam is permanent, and hence the flowage easement is permanent. Nature, through vegetation, shrubbery, etc., growing on the edges of the embankment, protects it from destruction by waves, ice, etc., but, by raising the elevation of the water on such embankment, nature's provision for such protection is not only destroyed on the surface actually covered by the water, but for several feet above. The water, being on both sides of the embankment, will percolate through the entire width thereof within a very short time. This can be prevented only by protecting the edges thereof by riprapping with rock or some other protective substance. The surface of the roadway will also require additional coating from time to time, especially immediately above the places where the water contacts directly the edges of the embankment. There can be no doubt but that the embankment at such places will ultimately be destroyed, because of the law of percolation and capillary attraction, and thus destroy the value of the entire roadway, unless adequately protected. The width is not sufficient to permit the embankment to withstand the constant ill effects of the water, ice, etc., at the elevation established by the flowage easement, unless it be protected and enforced.

 The question of what amounts to a "taking" under the Constitution has been discussed by the courts over a long period of years. Of course, appellee, at the time it built its roadway, had a right to rely upon the history of the height to which the water had risen at various flood periods, and its natural height, in determining the elevation to which it was to be constructed. If the elevation of the water is raised beyond its natural stage by artificial means and a flowage easement established, as in the instant case, it would

seem that the owner of the land affected must be justly compensated for the damages thus sustained. United States v. Lynah, 188 U.S. 445, 23 S.Ct. 349, 357, 47 L.Ed. 539; United States v. Cress, 243 U.S. 316, 37 S.Ct. 380, 385, 61 L.Ed. 746; United States v. Chicago, Burlington & Quincy Railroad Company (C.C.A.8th) 82 F.(2d) 131, 134. The Supreme Court of the United States, as early as 1872, in the case of Pumpelly v. Green Bay & M. Canal Company, 13 Wall.(80 U.S.) 166, 177, 20 L. Ed. 557, in construing the provision of the Wisconsin Constitution that "the property of no person shall be taken for public use without just compensation therefor" said: "It would be a very curious and unsatisfactory result, if in construing a provision of constitutional law, always understood to have been adopted for protection and security to the rights of the individual as against the government, and which has received the commendation of jurists, statesmen, and commentators as placing the just principles of the common law on that subject beyond the power of ordinary legislation to change or control them, it shall be held that if the government refrains from the absolute conversion of real property to the uses of the public it can destroy its value entirely, can inflict irreparable and permanent injury to any extent, can, in effect, subject it to total destruction without making any compensation, because, in the narrowest sense of that word, it is not taken for the public use. Such a construction would pervert the constitutional provision into a restriction upon the rights of the citizen, as those rights stood at the common law, instead of the government, and make it an authority for invasion of private right under the pretext of the public good, which had no warrant in the laws or practices of our ancestors." In the case of United States v. Lynah, supra, the court reaffirms the principles enunciated in the case of Pumpelly v. Green Bay & M. Canal Company, supra, and, after citing other cases and authorities, continues: "It is clear from these authorities that where the government by the construction of a dam or other public works so floods lands belonging to an individual as to substantially destroy their value there is a taking within the scope of the 5th Amendment." Some rather pertinent language is found in the case of United States v. Cress, supra, wherein the court, speaking through Mr. Justice Pitney, said: "The findings, however, render it plain that this is not a case of temporary flooding or of consequential injury, but a permanent condition, resulting from the erection of the lock and dam, by which the land is 'subject to frequent overflows of water from the river.' That overflowing lands by permanent back water is a direct invasion, amounting to a taking, is settled by Pumpelly v. Green Bay Co., 13 Wall. 166, 177, 20 L.Ed. 557, 560; United States v. Lynah, 188 U.S. 445, 468–470, 23 S.Ct. 349, 47 L.Ed. 539, 547–549. It is true that in the Pumpelly Case there was an almost complete destruction, and in the Lynah Case a complete destruction, of the value of the lands, while in the present case the value is impaired to the extent of only one half. But it is the character of the invasion, not the amount of damage resulting from it, so long as the damage is substantial, that determines the question whether it is a taking."

The Supreme Court, in the case of United States v. Grizzard, 219 U.S. 180, 31 S.Ct. 162, 163, 55 L.Ed. 165, 31 L.R.A.(N.S.) 1135, said: "The 'just compensation' thus guaranteed obviously requires that the recompense to the owner for the loss caused to him by the taking of a part of a parcel, or single tract of land, shall be measured by the loss resulting to him from the appropriation. If, as the court below found, the flooding and taking of a part of the plaintiff's farm has depreciated the usefulness and value of the remainder, the owner is not justly compensated by paying for only that actually appropriated, and leaving him uncompensated for the depreciation over benefits to that which remains. In recognition of this principle of justice it is required that regard be had to the effect of the appropriation of a part of a single parcel upon the remaining interest of the owner, by taking into account both the benefits which accrue and the depreciation which results to the remainder in its use and value."

At or about the time of the construction of Lock and Dam No. 4, other locks and dams were constructed by the government in the Mississippi river in the same vicinity, one of which was constructed near Hastings, Minn., which flooded the right of way of the Chicago, Burlington & Quincy Railroad Company. A similar situation was created by the construction of this dam, in so far as the right of way and the grade of the railroad company

are concerned, as in the instant case. The Circuit Court of Appeals for the Eighth Circuit, on February 10, 1936, announced its decision in that case. United States v. Chicago, Burlington & Quincy Railroad Company, supra. That was also a condemnation proceeding instituted by the government. It was the contention of the railroad company in that case that, in addition to the land actually and permanently flooded, it was entitled to be compensated for the expense of widening and raising its embankment to protect against the effect of saturation, wave actions, and distortion of ice; the expense of raising its culverts and bridges, and the riprapping with rock of the edges of its embankment. The damages claimed in that case, to a certain extent, are similar to those claimed in the instant case. In elaborating upon this phase of the case the court said: "It is probable that time was when many of the states of the Union on the matter of condemnation of private property for public use gave damages only when property was actually taken, and for so much as was actually taken, and refused to award compensation in cases wherein such property, or the remainder of the parcel, was only hurt or damaged as a consequence of the actual taking. But long since, recognizing the utter injustice of so narrow a view, amendments to the organic laws; to statutes, and changes in judicial interpretation well-nigh universally, have so changed the rule as now to give compensation for proximate damages to remaining parts of a parcel of land when some part thereof has been actually taken. In short, such change was wrought, by adding to the word 'taken' in the provisions of the Constitution, or to the statute, or by judicial interpretation, the words 'or damaged.'" While the facts are somewhat different from those in the instant case, yet it seems that the underlying principles are the same and should be governed by the same principles of law.

The cases relied upon by the government are distinguishable; the facts therein being vastly different from those in the case at bar. In the case of Sanguinetti v. United States, 264 U.S. 146, 44 S.Ct. 264, 68 L.Ed. 608, the language of the court demonstrates such differences: "The land would have been flooded if the canal had not been constructed, but to what extent does not appear. None of the land of appellant was permanently flooded, nor was it overflowed for such a length of time in any year as to prevent its use for agricultural purposes. * * * Under these decisions and those hereafter cited, in order to create an enforceable liability against the government, it is at least necessary that the overflow be the direct result of the structure, and constitute an actual, permanent invasion of the land, amounting to an appropriation of and not merely an injury to the property." In the case of Christman v. United States (C.C.A.7th) 74 F.(2d) 112, the land was between 50 and 60 miles upstream from the dam across the Ohio river at Louisville, Ky., and then lying in creek bottom some distance from the river. It was subject to overflow during a freshet, and, previous to the construction of the dam, did overflow practically every year. The water level in the creek was raised slightly by the construction of the dam, and it perhaps took less rainfall to overflow the land than theretofore, but this was merely an incident to the overflow and not the proximate cause thereof. In each case cited no actual invasion of the property existed. For instance, in the case of Gibson v. United States, 166 U.S. 269, 17 S.Ct. 578, 580, 41 L.Ed. 996, the court quoted with approval from an earlier case, that of Northern Transportation Company v. Chicago, 99 U.S. 635, 25 L.Ed. 336, as follows: "In those cases it was held that permanent flooding of private property may be regarded as a 'taking.' In those cases there was a physical invasion of the real estate of the private owner, and a practical ouster of his possession. But in the present case there was no such invasion. No entry was made upon the plaintiff's lot. All that was done was to render for a time its use more inconvenient."

In the instant case there is an actual invasion of appellee's property to its damage. Under proper instructions of the court as to the measure thereof, the jury found the extent of such damage to be in the amount of $4,443. The verdict of the jury is amply supported by the evidence, and the judgment is therefore affirmed.