## UNITED STATES v. CHICAGO, M., ST. P. & P. R. CO. et al. (two cases).
### Nos. 11300, 11301.

Circuit Court of Appeals, Eighth Circuit.

July 30, 1940.

Lawrence S. Apsey, Atty., Department of Justice, of Washington, D. C. (Norman M. Littell, Asst. Atty. Gen., John J. Courtney, Sp. Asst. to the Atty. Gen., and Jacob N. Wasserman, Atty., Department of Justice, of Washington, D. C., on the brief), for appellant.

A. C. Erdall, of Minneapolis, Minn. (F. W. Root and C. O. Newcomb, both of Minneapolis, Minn., A. N. Whitlock, of Missoula, Mont., and C. S. Jefferson, of Chicago, Ill., on the brief), for appellees.

Before GARDNER and SANBORN, Circuit Judges, and COLLET, District Judge.

SANBORN, Circuit Judge.

These appeals are from judgments awarding compensation to appellees in condemnation proceedings brought by the United States to acquire the right to flood—above Government Dam No. 5 in the Mississippi River—the right-of-way and embankment of the appellee Railroad Company upon which its tracks and the telegraph line of the appellee Western Union Telegraph and Cable Company are located. These judgments included compensation for four segments of embankment, and the structures thereon, in Wabasha and Winona counties, Minnesota, and the appeals relate only to the awards made for damages to those segments and structures.

The railroad of the appellee Railroad Company between St. Paul, Minnesota, and Chicago, Illinois, was constructed in 1870. Through Wabasha and Winona counties it followed generally the west bank, or rather the westerly margin of the bottom lands on the west side of the Mississippi River. In 1910 the roadbed was realigned and double-tracked. In the counties referred to, the four segments of the railroad embankment were built on lands which were then below the ordinary high-water mark of the river, but above the ordinary low-water mark. Before these segments were built, the Railroad Company had submitted to the United States Engineer in charge of the portion of the river affected, a map showing the proposed location of the realigned roadbed, and had been advised by him that the company might proceed with the work, the proposed realignment not having been found to be "prejudicial to the interests of navigation, or in any way interfering with the proposed Government improvement of the river."

In 1933 proceedings were commenced by the United States to condemn flowage easements upon lands affected by the higher levels created by Lock and Dam No. 5 built near Minneiska, Minnesota. This dam is one of a series of dams erected in carrying out the Upper Mississippi federal navigation project authorized by the River and Harbor Act of July 3, 1930, c. 847, 46 Stat. 927, as amended. The purpose of the project is to provide a nine-foot channel from Minneapolis, Minnesota, to the mouth of the Missouri River by building a series of dams with locks, to create slack-water pool navigation in the Upper Mississippi River. See United States v. Chicago, B. & Q. R. Co., 8 Cir., 82 F.2d 131, 106 A.L.R. 942; United States v. Chicago, B. & Q. R. Co., 7 Cir., 90 F.2d 161. The levels of the pools created by the dams are above the ordinary high-water levels of the river. The pool level above Dam No. 5, along the four segments of the embankment of the Railroad Company which are involved in these appeals, was from six to eight feet above the ordinary natural high-water mark of the river. That necessitated the removal by

the Government of the trees and brush from the bottom lands lying between the navigable portion of the river and the railroad embankment, and exposed the embankment to wind, wave and ice action. It is conceded that the appellees were obliged to strengthen and protect the railroad embankment and the structures used in connection therewith, to make them safe and adequate under the changed conditions created by the dam. In the condemnation proceedings the Railroad Company and the Telegraph Company were awarded, by commissioners, damages estimated to cover the reasonable cost of protecting their properties against the increased levels. The Government appealed from the awards. The issue of damages was tried to a jury in the court below.

Upon the trial, counsel for the Government in his opening statement asserted that the Government would introduce evidence to show that four segments of the railroad embankment had been built on land which lay below ordinary high-water mark, and that consequently the Government was not liable for any damages for injuries done to those segments. Opposing counsel objected upon the ground that such testimony would be immaterial. The Government did not contend that the land upon which any segment of the railroad embankment was built was below ordinary low-water mark or that the Railroad Company did not own it, or that it constituted any obstruction to the actual navigation of the river, except "that its presence burdens navigation with monetary loss or compensation."

The appellees disclaimed any damage to their properties from the raising of the level of the river to its ordinary high-water mark, but contended that, under the law, they were entitled to compensation for the damage to their properties caused by the flooding of the railroad embankment above ordinary high-water mark, without regard to whether it was located on lands above or below that level.

The court ruled that the Government had the right to flow the appellees' embankment and structures up to ordinary high-water mark without incurring liability to pay compensation; but that, since the embankment and structures did not interfere with navigation, the Government would be liable for damages caused by the flooding above ordinary high-water mark. The court sustained an objection to the offer of the Government to prove that the four des-

ignated segments of embankment—three in Winona County and one in Wabasha County—were constructed on lands lying between the ordinary high-water mark and the ordinary low-water mark, and that Congress had not consented to such construction, and that it had not been expressly authorized or approved by the Secretary of War or the United States Chief of Engineers. The verdict of the jury covered damages for the four segments, which were referred to throughout the litigation as "encroachment areas". These damages, it is conceded, represented the reasonable cost of strengthening and protecting, in these areas, the railroad embankment and the structures of the appellees so as to make them safe for use at the higher levels of the river created by Dam No. 5.

The Government questions only its liability to the Railroad Company and to the Telegraph Company for any compensation, or, in other words, asserts that the flooding of the railroad embankment in these four areas did not constitute a taking within the meaning of the Fifth Amendment to the Constitution of the United States, which prohibits the taking of private property for a public use without compensation.

One of these appeals involves the three "encroachment areas" in Winona County, and the other appeal involves the one "encroachment area" in Wabasha County. The appellees concede that when the Government acquired the right to flood the railroad embankment, the "encroachment area" in Wabasha County was upon land lying below the ordinary high-water mark of the river and above the ordinary low-water mark. They do not concede that the "encroachment areas" in Winona County were so situated, but acknowledge that it would be a jury question whether they were or not. For the purposes of this opinion, we shall assume that the "encroachment areas" are all upon lands lying below ordinary high-water mark and above ordinary low-water mark.

■ The Government concedes that the Railroad Company has title to the lands in suit. It contends, however, that in building the segments of the embankment on lands below ordinary high-water mark, the Railroad Company did not comply with the provisions of Section 9 of the Rivers and Harbors Act of March 3, 1899, c. 425, 30 Stat. 1151, 33 U.S.C. § 401, 33 U.S.C.A. § 401, which provides: "That it shall not

be lawful to construct or commence the construction of any bridge, dam, dike, or causeway over or in any navigable river * * * until the consent of Congress to the building of such structures shall have been obtained and until the plans for the same shall have been submitted to and approved by the Chief of Engineers and by the Secretary of War"; that therefore these embankments are unlawful structures; and that, in any event, the Railroad Company's title to its lands lying below the ordinary high-water mark was so limited and qualified that the appellees are not entitled to compensation for the flooding of the embankments constructed thereon.

Assuming that Section 9, above quoted, was applicable to the structures built by the Railroad Company, it is not apparent to us how the mere failure to obtain the formal consent required by that section could defeat the right of the company to compensation, under the Fifth Amendment, for the taking of its property for a public use. If the property had been subject to the right of the Government to flood it in the interests of navigation, without the payment of compensation, the consent of Congress to build the embankments would not have deprived the Government of that constitutional right. Louisville Bridge Co. v. United States, 242 U.S. 409, 37 S.Ct. 158, 61 L.Ed. 395. On the other hand, we think the failure of the Railroad Company to obtain the statutory consent to build an embankment which in no way interfered with or obstructed navigation would not deprive the appellees of any right to compensation which, under the Fifth Amendment, they would otherwise have had. Compare Jacobs v. United States, 290 U.S. 13, 17, 18, 54 S.Ct. 26, 78 L.Ed. 142, 96 A.L.R. 1; and Converse v. Portsmouth Cotton Oil Refining Corp., 4 Cir., 281 F. 981, 986. In Pike Rapids Power Co. v. Minneapolis, St. P. & S. S. M. R. Co., 8 Cir., 99 F.2d 902, 909, we said: "Unless Congress, therefore, should find it necessary in the regulation of commerce to abolish riparian rights it has no power to do so. Nothing in the statute [§ 9, c. 425, 30 Stat. 1151, 33 U.S.C.A. § 401], nor in its administration by the Chief of Engineers and the Secretary of War, nor in subsequent acts of Congress gives any support to the contention that Congress ever intended to take away such rights. Indeed the decisions of the Supreme Court rendered since 1899 disclose that such riparian rights, subject to the power of Congress to regulate their use to conform to the requirements of interstate commerce, are recognized by the federal government since the passage of that Act the same as they were before. See United States v. River Rouge Improvement Co., 1926, 269 U.S. 411, 46 S.Ct. 144, 70 L.Ed. 339; United States v. Chandler-Dunbar Water Power Co., 1913, 229 U.S. 53, 33 S.Ct. 667, 57 L.Ed. 1063; Lewis Blue Point Oyster Cultivation Co. v. Briggs, 1913, 229 U.S. 82, 33 S.Ct. 679, 57 L.Ed. 1083, Ann.Cas.1915A, 232. The statute is intended only to protect the paramount right of the United States to control the use of the river in the interest of navigation."

It is to be noted that the Government for thirty years has made no objection to the location of the portions of the railroad embankment in suit. It does not now object to their location, but merely objects to having to pay for the injuries done to them by the dam.

The question which we are required to decide is this: Where a riparian owner of land bordering upon a navigable river, only a portion of the entire bed of which is used and useful for purposes of navigation under natural conditions, has built an embankment upon that part of his land lying between the ordinary high-water mark and the ordinary low-water mark of the river, which embankment does not interfere with or obstruct navigation, can the United States, for the purpose of improving navigation, build a dam in the river which raises its waters above their natural level and which floods the riparian owner's embankment, without incurring any liability to compensate him for injuries caused solely by raising the waters of the river above their natural level?

The Government contends that it has the right, in aid of navigation and without payment of compensation, to take or destroy property in the river bed; that this right extends to all property lying between the ordinary high-water marks projected horizontally from shore to shore; that the right of the United States thus to take or destroy property in the river bed without paying compensation includes those portions of such property which are situated above the ordinary high-water mark, and extends to intangible riparian rights, including the right to the natural level, width and flow of the stream.

The appellees contend that in Minnesota the fee title of a riparian owner extends to ordinary low-water mark, subject to the

paramount public right of navigation under the natural conditions of the stream; that the servitude of riparian lands to the public right of navigation is confined to the natural widths, levels and flows of the river, and that when the Government imposes a more onerous servitude than that upon such lands, it must pay for what it takes.

■ The weakness of the Government's position in this case is that it artificially created the situation out of which the claims for compensation here involved arose, by erecting a dam which has destroyed the natural condition of the river, and has imposed upon the lands of riparian owners a servitude that such lands would not otherwise have had to bear. If the servitude to which the riparian lands of the Railroad Company is subject is as great as the Government contends, then, of course, the appellees have suffered injuries which are not compensable, for, while the Railroad Company owns its lands to ordinary low-water mark, its ownership between that mark and ordinary high-water mark is subordinate to the public right of navigation and subject to the power of the United States to use the river bed for purposes of navigation. Pike Rapids Power Co. v. Minneapolis, St. P., & S. S. M. R. Co., 8 Cir., 99 F.2d 902, 910, 911, 912.

■ The general rule is that private ownership of property on the banks and in the beds of navigable streams is subject to the public right of navigation and the governmental control and regulation necessary to make that right fully effective. But the public right of navigation to which such lands are subject (without payment of compensation) is limited to the natural state of the stream. This was the ruling in United States v. Cress, 243 U.S. 316, 37 S.Ct. 380, 61 L.Ed. 746, which involved the flowing of riparian lands by locks and dams constructed in the Cumberland and Kentucky Rivers in aid of navigation. The court said (243 U.S. at pages 325–327, 37 S.Ct. at page 384, 61 L.Ed. 746):

"It follows from what we have said that the servitude of privately-owned lands forming the banks and bed of a stream to the interests of navigation is a natural servitude, confined to such streams as, in their ordinary and natural condition, are navigable in fact, and confined to the natural condition of the stream. And, assuming that riparian owners upon non-navigable tributaries of navigable streams are subject to such inconveniences as may arise from the exercise

of the common right of navigation, this in like manner must be limited to the natural right. The findings make it clear that the dams in question, constructed by the government in the Cumberland and Kentucky rivers, respectively, are for raising the level of those streams along certain stretches by means of backwater, so as to render them, to the extent of the raising, artificial canals instead of natural waterways. In the language of engineering, the government has 'canalized' the rivers. * * *

"But the authority to make such improvements is only a branch of the power to regulate interstate and foreign commerce, and, as already stated, this power, like others, must be exercised, when private property is taken, in subordination to the 5th Amendment. Monongahela Navigation Co. v. United States, 148 U.S. 312, 336, 13 S.Ct. 622, 37 L.Ed. 463, 471; United States v. Lynah, 188 U.S. 445, 465, 471, 23 S.Ct. 349, 47 L.Ed. 539, 546, 549. And we deem it clear that so much of the properties of the respective defendants in error as was unaffected by the flow of the rivers or their tributaries prior to the construction of the locks and dams in question was private property, and not subject to be overflowed, without compensation, in the raising of the level of the rivers by means of artificial dams."

See, also, United States v. Chicago, B. & Q. R. Co., 8 Cir., 82 F.2d 131, 134, 106 A.L.R. 942; Jacobs v. United States, 5 Cir., 45 F.2d 34, 37; Jacobs v. United States, 290 U.S. 13, 54 S.Ct. 26, 78 L.Ed. 142, 96 A.L.R. 1.

The opinion in the Cress case does not disclose that any of the lands there involved were below high-water mark, but it refers to "privately-owned lands forming the banks and bed of a stream", which is the exact situation in the case at bar. The opinion in the Cress case refers to United States v. Lynah, 188 U.S. 445, 23 S.Ct. 349, 47 L.Ed. 539, saying (page 325 of 243 U.S., page 384 of 37 S.Ct., 61 L.Ed. 746): "In United States v. Lynah, 188 U.S. 445, 23 S.Ct. 349, 47 L.Ed. 539, the same principle was applied in the case of an operation by the government of the United States. For the improvement of the navigation of the Savannah river certain dams and other obstructions were placed and maintained in its bed, with the result of raising the water above its natural height and backing it up against plaintiff's embankment upon the river and interfering

with the drainage of their plantation. This was held (pages 465, 471 [of 188 U.S., 23 S.Ct. 349, 47 L.Ed. 539]) to be a taking of private property, requiring compensation under the 5th Amendment, notwithstanding the work was done by the government in improving the navigation of a navigable river. The raising of the water above its natural level was held to be an invasion of the private property thereby flowed."

The opinion in the Lynah case shows that the land flowed by the Government dam was a rice plantation, a large portion of which lay between high-water mark and low-water mark, and was subject to overflow as the water passed from one stage to the other; that this natural overflow was stopped by an embankment, and by means of flood gates therein the land was flooded and drained at the will of the owner. The result of the increased levels caused by the dam was to destroy the usefulness of the embankment, to raise the water on the plantation about 18 inches, and to convert a valuable rice plantation into a bog. This was held to be a taking.

The Lynah and Cress cases appear to be decisive of this case. The Government appreciates that the Lynah case is opposed to its contentions. In its brief it says:

"United States v. Lynah, 188 U.S. 445 [23 S.Ct. 349, 47 L.Ed. 539] (1903) and cases following it (Williams v. United States, 104 F. 50 (C.C.S.C., 1900), aff'd, 188 U.S. 485 [23 S.Ct. 363, 47 L.Ed. 554] (1903); King v. United States, 59 F. 9 (C.C.S.C., 1893); Lowndes v. United States, 105 F. 838 (C.C.S.C., 1901); and Heyward v. United States, 46 Ct. Cl. 484 (1911), 52 Ct. Cl. 87 (1917) aff'd per cur. by an evenly divided court, 250 U.S. 633 [39 S.Ct. 490, 63 L.Ed. 1181] (1919)) are overruled or limited to their precise facts by Willink v. United States, supra [240 U.S. 572, 36 S.Ct. 422, 60 L.Ed. 808] (1916). See Greenleaf [Johnson] Lumber Co. v. Garrison, supra [237 U.S. 251], at 263 [35 S.Ct. 551, 59 L. Ed. 939] (1915).

"Cf. Philadelphia Co. v. Stimson, 223 U. S. 605 [32 S.Ct. 340, 56 L.Ed. 570] (1912)."

It is interesting to note that in the Cress case, at pages 320, 321 of 243 U.S., 37 S.Ct. at page 382, 61 L.Ed. 746, the Supreme Court cites Greenleaf-Johnson Lumber Co. v. Garrison, supra, Philadelphia Co. v. Stimson, supra, and Willink v. United States, supra, in support of the general rule "that private ownership of property in the beds and waters of navigable streams is subject to the exercise of the public right of navigation, and the governmental control and regulation necessary to give effect to that right"; and then points out that "it has become well established that the test of navigability in fact is to be applied to the stream in its natural condition, not as artificially raised by dams or similar structures; that the public right is to be measured by the capacity of the stream for valuable public use in its natural condition; that riparian owners have a right to the enjoyment of the natural flow without burden or hindrance imposed by artificial means, and no public easement beyond the natural one can arise without grant or dedication save by condemnation, with appropriate compensation for the private right."

The Willink case, 240 U.S. 572, 36 S.Ct. 422, 60 L.Ed. 808, was decided before the Cress case. An analysis of the Willink case discloses no conflict with either the Cress case or the Lynah case. The Willink case did not involve damages to property caused by artificial water levels. Willink had a wharf and a marine railway, used for repairing vessels. These structures extended into the waters of the harbor of the Savannah River at Savannah, Georgia. Willink's structures were in part below the mean high-water line. The lower end of his railway was under water at high tide. He maintained piling on both sides of the railway to prevent its becoming obstructed by mud. Prior to May 4, 1889, Willink's property was outside of the harbor line. On that date the Secretary of War, under the authority of an act of Congress, re-established the harbor line so as to bring Willink's structures within it. In 1892, Willink undertook to renew his piling and wharf. He was requested by a Government Engineer to desist, and was threatened with prosecution if he did not desist. Thereafter he operated his facilities as best he could, but, because of the fact that his piling and wharf were not renewed, he was able to repair only smaller vessels and was obliged to dredge. This condition continued until 1897, when the harbor line as it had existed prior to May 4, 1889, was restored. Willink contended that he was entitled to be compensated for the expense of dredging and for what he had lost from his inability to repair large vessels. The Supreme Court ruled that there was not a taking, since the possession of his upland had not been disturbed, and that the request that he desist from renew-

ing his structures had deprived him of no rights; that, the river being navigable and tidal, whatever rights he had in the land below the mean high-water line were subordinate to the public right of navigation and the power of Congress to employ all appropriate means to keep the river open and its navigation unobstructed; that, if navigation was likely to be injuriously affected by the presence of structures below the mean high-water line, Congress could prevent their renewal without payment of compensation; that Congress had authorized the Secretary of War to establish the harbor lines and had made it unlawful to extend any wharf or other works within the harbor area, except under regulations of the Secretary; that Willink's piling and wharf were below the mean high-water line and within the harbor area, and, since he was proceeding to renew his piling in violation of the statute, the engineer officer properly requested him to desist.

In principle, the Willink case follows United States v. Chandler-Dunbar Water Power Co., 229 U.S. 53, 33 S.Ct. 667, 57 L.Ed. 1063. There was involved in that case the right of a riparian owner to compensation for the loss of structures erected under a revocable license from the Secretary of War, in the bed of the St. Marys River. Congress, by an Act of 1909, had determined, in effect, that these structures were obstructions to navigation, and that the entire bed and flow of the river was necessary for the purposes of navigation. The court pointed out that, under the laws of Michigan, the riparian owner had title to the river bed opposite its (the riparian owner's) upland out to the middle thread of the stream, but that its title was subject to the power of Congress over the improvement of navigable rivers for purposes of navigation, and that the judgment of Congress as to whether or not a construction in or over such a river is or is not an obstacle to navigation is conclusive. The court ruled that, since Congress had determined that the structures of the riparian owner in the river bed were obstacles to navigation, the loss of them did not entitle the owner to compensation. It is to be noted, also, that in that case no question of damages resulting from the creation of artificial levels in the river was involved. See, also, Greenleaf-Johnson Lumber Co. v. Garrison, 237 U.S. 251, 35 S.Ct. 551, 59 L.Ed. 939.

■ Since the embankment and structures of the appellees are not claimed to be, and are not, obstructions to navigation, and have not been determined by Congress to be such obstructions, we think that, under the rule announced in the Lynah and Cress cases, the flooding of the appellees' property, here involved, above ordinary high-water mark was a taking of their property, for which they were entitled to compensation.[1]

■ Our conclusion is that the court below ruled correctly in excluding evidence to show that portions of the railroad embankment rested upon lands lying between the high-water mark and the low-water mark of the river. It is unnecessary to consider other questions.

The judgments appealed from are affirmed.

---

[1] See and compare the following cases dealing with the right to recover compensation for lands affected by flowage from dams: Pumpelly v. Green Bay & Miss. Canal Co., 13 Wall. 166, 80 U.S. 166, 20 L.Ed. 557; Kaukauna Water-Power Co. v. Green Bay & Miss. Canal Co., 142 U.S. 254, 12 S.Ct. 173, 35 L.Ed. 1004; Manigault v. Springs, 199 U.S. 473, 26 S.Ct. 127, 50 L.Ed. 274; United States v. Welch, 217 U.S. 333, 30 S.Ct. 527, 54 L.Ed. 787, 28 L.R.A.,N.S., 385, 19 Ann.Cas. 680; United States v. Grizzard, 219 U.S. 180, 31 S.Ct. 162, 55 L. Ed. 165, 31 L.R.A.,N.S., 1135; Hurley v. Kincaid, 285 U.S. 95, 52 S.Ct. 267, 76 L.Ed. 637; Jacobs v. United States, 290 U.S. 13, 54 S.Ct. 26, 78 L.Ed. 142, 96 A. L.R. 1; United States v. Chicago, B. & Q. R. Co., 8 Cir., 82 F.2d 131, 106 A.L.R. 942; United States v. Chicago, B. & Q. R. Co., 7 Cir., 90 F.2d 161; United States v. Wabasha-Nelson Bridge Co., 7 Cir., 83 F.2d 852; Karlson v. United States, 8 Cir., 82 F.2d 330; United States v. Wheeler Township, 8 Cir., 66 F.2d 977.